Frederick E. LEWIS

v.

**AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL–CIO, Appellant.**

No. 17297.

United States Court of Appeals
Third Circuit.

Argued Dec. 17, 1968.

Decided Feb. 24, 1969.

Rehearing Denied March 25, 1969.

Act (LMRDA) of 1959,[1] initiated by Frederick E. Lewis who sought reinstatement to union membership following his expulsion from the organization. His ouster was the culmination of extensive intraunion trial proceedings, ending in an unsuccessful appeal to the highest tribunal of the union international.

Alleging that his expulsion was in violation of § 101(a) (5)[2] of the LMRDA, Lewis was successful in having the District Court order his reinstatement. The union has appealed.

■ It was incumbent upon Lewis to prove a denial of his rights under § 101, described by Congress as the "Bill of Rights of Members of Labor Organizations". He did not dispute that he was served with "written specific charges" or "given a reasonable time to prepare his defense". His case was predicated on a contention that he was not "afforded a full and fair hearing". And it was a narrow contention at best. He did not deny that he was afforded the opportunity to present witnesses at the hearing, to cross-examine those who appeared against him, and to be heard by testimony, exhibit, and argument. He made no allegation of prejudice or bias by either the chairman of the union's Judicial Panel who heard his case or the entire panel who reviewed the proceedings. His sole basis for alleging a denial of a "full and fair hearing" was an argument that the necessary quantum of evidence to sustain the charges was not presented before the union's tribunal. The District Court agreed with him. Our function now is to review the legal framework supporting the court's decision.

Ronald Rosenberg, Van Arkel & Kaiser, Washington, D. C. (Wilderman, Markowitz & Kirschner, Richard Kirschner, Philadelphia, Pa., on the brief), for appellant.

David C. Harrison, Kramer & Harrison, Philadelphia, Pa. (Mitchell A. Kramer, Philadelphia, Pa., on the brief), for appellee.

Before SEITZ, ALDISERT and STAHL, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

This case arose as a civil action under the provisions of § 102 of the Labor-Management Reporting and Disclosure

1. 73 Stat. 519, 29 U.S.C.A. § 412.
"§ 412. Civil action for infringement of rights; jurisdiction
Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States * * *."

2. 73 Stat. 522, 29 U.S.C.A. § 411(a) (5).
"(5) Safeguards against improper disciplinary action.

No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing."

**1188**

■ In attacking the validity of the action taken by the court below, the appellant advances two separate arguments. First, it is contended that there is no statutory authority or jurisdiction for a federal court to review disciplinary action taken by a union against an officer where the charges emanated from his conduct as an officer of the union, as distinguished from conduct as a member.[3] In the alternative, it is argued that the court, assuming its authority to hear the case, should not have disturbed the union's action since the record before the union's judicial panel demonstrates that the full and fair hearing requirements of § 101(a) (5) were indeed satisfied.

■ We find no merit to the appellant's first argument. Irrespective of Lewis' status as a union officer, he was found guilty of violating provisions of the union's constitution which prescribed expulsion from membership, not merely removal from office, as the penalty. His loss of membership clearly came within the purview of §§ 101(a) (5) and 102 of the LMRDA, a violation of which empowers the federal courts to grant appropriate relief.[4]

3. Initially, it should be pointed out that the appellant has erred in labeling this a jurisdictional issue. Although some courts (e. g., Mamula v. Local 1211, United Steelworkers of America, 202 F.Supp. 348, 349 (W.D.Pa.1962)) have characterized the question as one of the "jurisdiction" of the federal courts to hear the action, Judge Kalodner, in Sheridan v. United B'hd. of Carpenters, Etc., 306 F.2d 152, 156 (3 Cir. 1962), correctly pointed out that " 'the well established * * * practice * * * has been that the assertion of a substantial claim under a federal statute gives a United States court jurisdiction of that claim even though that court may determine ultimately that no cause of action on which relief could have been granted was alleged' " (quoting from Hughes v. Local 11 of Int'l. Ass'n of Bridge Workers, 287 F.2d 810, 814 (3 Cir. 1961)). To avoid confusion and for the purpose of consistency with prior decisions of this Court, we will treat the union's contention as an assertion that "plaintiff has failed to plead or prove a violation of the Act." Sheridan, supra, at page 156.

4. The cases cited by appellant to support its argument are inapplicable. Those cases involved either suits by an officer under § 609 for alleged violations of his Title I rights (e.g., equal rights of members, freedom of speech and assembly, protection of the right to sue, etc.) or attempted suits under § 101(a) (5) for removal from office (recognized almost universally as not within the purview of the section).

Appellant's reliance on our holding in Sheridan v. United B'hd. of Carpenters, Etc., 306 F.2d 152 (3 Cir. 1962), is therefore misplaced. Sheridan is distinguishable because: (1) the plaintiff was not expelled from membership but was merely removed from office, and was asserting not a membership right but only a right to office; (2) the plaintiff brought suit under §§ 101(a) (4) and 609, claiming a right of action because he performed certain acts which he alleged were protected under Title I; it was not a § 101(a) (5) "fair hearing" suit as was brought in the instant case. The significance of the distinction between § 101(a) (5) as opposed to § 609 suits is emphasized in Kroner, Title I of the LMRDA: Some Problems of Legal Method and Mythology, Symposium, 43 N.Y.U.L.Rev. 280 (1968).

Nor is Grand Lodge of Int'l. Ass'n of Machinists v. King, 335 F.2d 340 (9 Cir. 1964), applicable to the case at bar. In Grand Lodge, discharged union officers brought suit under § 101(a) (5) for reinstatement alleging that their summary removal from office violated the fair hearing requirement of § 101(a) (5).

The following cases cited by appellant are also inapposite. Verbiscus v. Industrial Union of Marine & Shipbuilding Wkrs., 238 F.Supp. 848 (E.D.Mich.1964) (removal from office) ; Mamula v. Local 1211, United Steelworkers of America, 202 F.Supp. 348 (W.D.Pa.1962) (deposed officer alleged that the procedure used in effectuating his removal from office was improper); Burton v. Independent Packinghouse Workers Union, 199 F.Supp. 138 (D.Kan.1961) (removal of officer from office not subject to the protection of § 101(a) (5)); Hamilton v. Guinan, 199 F.Supp. 562 (S.D.N.Y. 1961) (removal from office not within the purview of § 101(a) (5)).

For an excellent analysis of the reasons for the exclusion of removal from office from the purview of § 101(a) (5), see Grand Lodge of Int'l. Ass'n of Machinists v. King, supra. It is to be not-

Having determined that the present case was one in which the District Court was empowered to act, we turn to a consideration of appellant's second contention, which in effect is an allegation that the lower court exceeded the proper scope of review, both in concept and application, when it determined that the union's actions were not based on "substantial evidence".[5]

Our initial difficulty in examining the action of the court below stems from the failure of Congress to provide an explicit expression of the proper scope of reviewing power over the union's hearing procedures. The bald language of § 102 of the Act provides simply that "[a]ny person whose rights * * * have been infringed by any violation of this title may bring a civil action * * * for such relief (including injunctions) as may be appropriate." Scant guidance is provided by § 101(a) (5), which provides only that the hearing must be "full and fair".

■ Where, as here, there is no allegation of a denial of procedural due process, no claim of overreaching by those who conducted the hearing, no allegation of discrimination—in substance, no allegation of a denial of a "full" hearing in the sense that the "full" story was not presented before the union—and no legislative description of the quantum of evidence necessary to constitute a "full and fair hearing",[6] resort must be made to both judicial precedents and the history of the statutory proceedings to implement properly the directive of Congress.

■ It has been said that the requirement of a "full and fair" hearing is considerably short of an authorization for a full review of the "law" and the facts.[7] An examination of the proceedings surrounding the adoption of vital labor legislation gives credence to this proposition. Moreover, such an examination discloses that Congress is as deliberate in fashioning guidelines for appeals to federal court in labor matters as it is in framing the substantive law thereof; it compels the conclusion that the failure of Congress to prescribe in the LMRDA of 1959 the same scope of judicial review as contained in other labor legislation must not be considered an oversight or casual omission.

---

ed that none of the reasons for removing dismissal from office from the full and fair hearing requirement (*e.g.*, the absolute necessity for immediate removal before an errant officer can do irreparable financial or moral harm to the union) have any applicability to cases of expulsion from membership.

5. After a detailed examination of the whole record and the taking of additional testimony, the District Court concluded that there was no "substantial evidence" to support the charges and that appellee was denied a full and fair hearing. Appellee maintains that unless the charges are supported by substantial evidence the reviewing court is correct in overturning the action of the union tribunal.

6. Cf., Appeals from the decisions of certain designated administrative agencies where Congress has more precisely outlined the function of the reviewing court:

"[T]he reviewing court shall—
\* \* \* \* \*

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."
80 Stat. 393, 5 U.S.C.A. § 706(2).

7. Christensen, "Union Discipline Under Federal Law: Institutional Dilemmas in an Industrial Democracy", Symposium, 43 N.Y.U.L.Rev. 227, 253 (1968).

The grandfather of modern labor legislation, the Wagner Act of 1935,[8] originally provided that the findings of the National Labor Relations Board "as to the facts if supported by the evidence, shall be conclusive". The Supreme Court read "evidence" to mean "substantial evidence", and defined such evidence to mean more than a mere scintilla, more than that which would create a suspicion of the existence of the fact to be established, but relevant evidence that a reasonable mind might accept as adequate to support a conclusion; enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.[9]

In the Administrative Procedure Act of 1946, Congress set forth in meticulous detail the circumstances under which, in reviewing the action of certain designated agencies, the "court shall * * * hold unlawful and set aside agency action, findings, and conclusions found to be: [inter alia] unsupported by substantial evidence." [10]

In the Labor Management Relations Act of 1947, Congress amended the original Wagner Act quantum-of-evidence standard to read that the "findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole [11] shall be conclusive." [12]

8. The National Labor Relations Act (popularly known as the Wagner Act), 49 Stat. 449, 29 U.S.C.A. § 151 et seq. (1935). This statute was amended and supplemented by the Labor Management Relations Act, 1947 (popularly known as the Taft-Hartley Act), 61 Stat. 136, 29 U.S.C.A. § 141 et seq. (1947), and later amended again by the LMRDA of 1959, 73 Stat. 519, Title II, §§ 201(d) and (e), and Title V, § 505, and Title VII. The balance of Titles II and V and all of Titles I, III, IV, and VI, of the LMRDA constitute original legislation.

9. Washington, Virginia & Maryland Coach Co. v. National Labor Relations Board, 301 U.S. 142, 57 S.Ct. 648, 81 L.Ed. 965 (1937); Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938); National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939); Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

10. 5 U.S.C.A. § 706(2) (E). The Senate Judiciary Committee had reported: "The 'substantial evidence' rule set forth in Section 10(e) is exceedingly important. As a matter of language, substantial evidence would seem to be an adequate expression of law. The difficulty comes about in the practice of agencies to rely upon (and of courts to tacitly approve) something less—to rely upon suspicion, surmise, implications, or plainly incredible evidence. It will be the duty of the courts to determine in the final analysis and in the exercise of their independent judgment, whether on the whole record the evidence in a given instance is sufficiently substantial to support a finding, conclusion, or other agency action as a matter of law. In the first instance, however, it will be the function of the agency to determine the sufficiency of the evidence upon which it acts—and the proper performance of its public duties will require it to undertake this inquiry in a careful and dispassionate manner. Should these objectives of the bill as worded fail, supplemental legislation will be required." S.Rep. No. 752, 79th Cong., 1st Sess. 28, 30–31. The House Committee Report is to substantially the same effect. H.R. Rep. No. 1980, 79th Cong., 2d Sess. 45. The reports are reprinted in S.Doc. No. 248, 79th Cong., 2d Sess. 155, 216–217, 279.

11. 61 Stat. 136, 29 U.S.C.A. §§ 141 et seq., 160(c) (popularly known as the Taft-Hartley Act). After much committee discussion, Congress deliberately inserted the provision calling for consideration of the record as a whole. Some court decisions had previously held that the requirement of substantial evidence was met if only the evidence supporting the Board's decision was taken into account with no consideration of the evidence contradicting it.

12. 29 U.S.C.A. § 160(e). "The bill as reported to the House provided that the 'findings of the Board as to the facts shall be conclusive unless it is made to appear to the satisfaction of the court either (1) that the findings of fact are against the manifest weight of the evidence, or (2) that the findings of fact are not supported by substantial evidence.' The bill left the House with this provision. Early committee prints in the Senate provided

■ There is sound reason for the adoption of a substantial-evidence test in legislation such as the Wagner Act, the applicable areas of the Administrative Procedure Act, and the LMRDA of 1947: federal agencies governed by these acts perform what has traditionally been regarded as an essentially judicial function, and but for these statutorily-created tribunals, the task of adjudicating and enforcing the legislative mandate would fall to the traditional courts of law. Considering the potential which these agencies possess to render far-reaching decisions which significantly affect the national interest, and recognizing that these "legislative courts" are relatively new to the art of adjudication and the rule of precedent and tradition which inherently characterize the judicial function, it is eminently proper that these agencies be subject to close scrutiny by the courts.

Similar considerations are not presented in problems of internal union discipline. Such matters generally have little impact beyond the organization itself. By their very nature they have no significance as precedents in any legal sense of the word; they involve matters of organizational discipline, essentially internal in concept and effect.

It is therefore not surprising that the congressional debate which preceded the adoption of the LMRDA of 1959 discloses no significant intent to adopt standards of review equivalent to the substantial-evidence test enunciated in earlier legislation.

The Supreme Court has also reflected this philosophy of judicial restraint in labor affairs. In United Steelworkers of America v. Warrior & Gulf Navig. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), the Court admonished the courts to exercise the utmost restraint and to tread gingerly before intruding upon the arbitral process. The basic philosophy underlying the court's "hands-off" policy is very simple—labor matters are best left to those who understand the language and the workings of the shop, those who have a precise knowledge of what has come to be known as the "industrial common law". Even the "ablest judge cannot be expected to bring the same experience and competence [as an arbitrator] to bear upon the determination of a grievance, because he cannot be similarly informed." [13]

The reasoning of the Supreme Court in the "Trilogy" applies with equal force to cases arising out of internal union discipline. "The provisions of the L.M.R.D.A. were not intended by Congress to constitute an invitation to the courts to intervene at will in the internal affairs of unions. Courts have no special expertise in the operation of unions which would justify a broad power to interfere * * * General supervision of unions by courts would not contribute to the betterment of the unions or their members or to the cause of labor-management

for review by 'weight of the evidence' or 'clearly erroneous' standards. But, as the Senate Committee Report relates, 'it was finally decided to conform the statute to the corresponding section of the Administrative Procedure Act where the substantial evidence test prevails.' In order to clarify any ambiguity in that statute, however, the committee inserted the words 'questions of fact, if supported by substantial evidence on the record considered as a whole * * *.'

"This phraseology was adopted by the Senate. The House conferees agreed. They reported to the House: 'It is believed that the provisions of the conference agreement relating to the courts' reviewing power will be adequate to preclude such decisions as those in N.L.R.B.

v. Nevada Consol. Copper Corp., 316 U. S. 105, 62 S.Ct. 960, 86 L.Ed. 1305 and in the Wilson, Columbia Products, Union Pacific Stages, Hearst, Republic Aviation, and Le Tourneau, etc., cases, supra, without unduly burdening the courts.' The Senate version became the law." Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 498, at 484–486, 71 S.Ct. at 463.

13. United Steelworkers, supra, at 582, 80 S.Ct. at 1353. The same theme is echoed in the other two cases of the now famous "Trilogy". See United Steelworkers v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

relations." Gurton v. Arons, 339 F.2d 371, 375 (2 Cir. 1964).

In the final analysis, courts must constantly wrestle with conflicting considerations in reviewing cases of union discipline. They must avoid overzealous intervention in the internal affairs of unions with its concomitant atrophic effect on the ability of the organization to function as a disciplined unit, being careful not to subject the union's interpretation of its own industrial jurisprudence to the "removed, untutored, and possibly antipathetic judgment of a court".[14] On the other hand, they must recognize that judicial timidity or indifference can leave those who seek to exercise their rights helplessly vulnerable.[15] They must be cognizant that all the trappings of procedural due process come to naught if the union tribunal may, in Dreyfus fashion, expel a member based on charges supported by no evidence.

■ Accordingly, total judicial abstention from the review of union disciplinary proceedings is unacceptable. Such an abdication would be contrary to the clear directive of Congress that rights may not be impaired without strict adherence to procedural and substantive due process, including ultimate redress to the federal courts; it would also run counter to the traditional role the judicial branch has fulfilled in protecting the exercise of all legitimate rights.

■ Thus, although the LMRDA is comparatively new legislation, judicial involvement in the internal affairs of labor is not. State courts have been reviewing intraunion disputes for almost seventy years,[16] and since statutes are not enacted in a vacuum, it is logical to assume that Congress was aware of this substantial body of state judicial precedent when it determined to adopt a federal right of review over internal union functions.[17] Moreover, in the absence of any significant federal precedents in this area of court-union relations,[18] the decisions of the state courts can provide helpful guides to the meaning of a "full and fair hearing" as that term is used in the LMRDA.[19]

14. Christensen, *supra*, 43 N.Y.U.L.Rev. at 254.

15. Summers, The Law of Union Discipline: What the Courts Do in Fact, 70 Yale L.J. 175, 178 (1960). "Discipline is the criminal law of union government. It is the critical device for maintaining internal order, enforcing obligations of membership, and compelling adherence to union standards in employment. It strengthens the union as an effective bargaining representative, and is essential for internal democracy."

16. See, *e.g.*, People ex rel. Deverell v. Musical Mutual Protective Union, 118 N.Y. 101, 23 N.E. 129 (1889) (expulsion from membership).

17. Many of the federal cases which have construed the meaning of a full and fair hearing have, because of the lack of federal precedent in this area, developed rules of law based essentially on prior state court decisions. See, *e.g.*, Vars v. Int'l. B'hd. of Boilermakers, Etc., 320 F.2d 576 (2 Cir. 1963), which relied on the pre-LMRDA state court case of Madden v. Atkins, 4 N.Y.2d 283, 171 N.Y.S. 2d 103, 151 N.E.2d 73 (1958), in determining the quantum of evidence which

must be shown to be present in order to satisfy the full and fair hearing requirement.

18. Prior to the passage of the LMRDA, the few internal union discipline cases which were brought in the federal courts were dismissed for lack of jurisdiction without any consideration on the merits. See, *e.g.*, Underwood v. Maloney, 256 F.2d 334 (3 Cir. 1958).

19. It has been observed that the then Sen. John F. Kennedy, in opposing the inclusion of the "Bill of Rights" (Title I) section of the Act, argued that broader protection of these rights was already provided by state courts. 105 Cong.Rec. 6481–87 (1959). Probably as a result of Senator Kennedy's position § 103 was added, expressly preserving all existing state rights and remedies:

"Nothing contained in this title shall limit the rights and remedies of any members of a labor organization under any State or Federal law or before any court or other tribunal, or under the constitution and bylaws of any labor organization."

Thus, most commentators felt that "[f]ederal legislative protection was thus

A distillation of the holdings of state courts discloses the development of the following concepts: (1) the constitution of the union is a contract between the union and its members, and it may properly provide qualifications for entry into and expulsion from union membership;[20] (2) disciplinary provisions which call for expulsion will be enforced so long as the constitutionally-mandated grounds for expulsion are not of themselves illegal as violating public policy—e.g., provisions prohibiting the criticism of and opposition to union leadership;[21] (3) where the proceedings within the organization have been regular, fair, and free from fraud, and the party whose rights are involved has been given the opportunity to appear and be heard, the courts will not inquire into the merits of the case or review the action of the association;[22] (4) so long as there is some evidence to support the specific charges in the union's proceedings, the courts are not to weigh the credibility of the witnesses or to evaluate the quantum of the evidence adduced at the hearing.[23]

superimposed on state judicial protection, reinforcing and not supplanting it." See Summers, *supra*, 70 Yale L.J. 175, 176 (1960).

Considerable doubt has been cast upon Professor Summers' assessment of the role of state courts after LMRDA by various Supreme Court decisions. See International Ass'n of Machinists v. Gonzales, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed. 2d 1018 (1958); San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 79 S. Ct. 773, 3 L.Ed.2d 775 (1959); Local 100, Journeymen v. Borden, 373 U.S. 690, 83 S.Ct. 1423, 10 L.Ed.2d 638 (1963).

20. Polin v. Kaplan, 257 N.Y. 277, 281–82, 177 N.E. 833, 834 (1931): "The constitution and by-laws of an unincorporated association express the terms of a contract which define the privileges secured and the duties assumed by those who have become members. As the contracts may prescribe the precise terms upon which membership may be gained, so may it conclusively define the conditions which will entail its loss. Thus, if the contract reasonably provides that the performance of certain acts will constitute a sufficient cause for the expulsion of a member, and that charges of their performance, with notice to the member, shall be tried before a tribunal set up by the association, the provision is exclusive, and the judgment of the tribunal, rendered after a fair trial, that the member has committed the offenses charged and must be expelled, will not be reviewed by the regularly constituted courts. * * * This is not to say, however, that a court will decline to interfere, if an expulsion has been decreed for acts not constituting violations of the constitution and by-laws, and not made expellable offenses thereby, either by terms expressed or implied. In such an instance, the expulsion is not within the power conferred by the contract."

21. Madden v. Atkins, 4 N.Y.2d 283, 171 N.Y.S.2d 103, 151 N.E.2d 73 (1958). This state-developed rule is similar to an action under § 609 where a member has been disciplined because he exercised some right guaranteed by Title I. The infirmity is not in the procedure used or the method of discipline, but in the fact that the discipline is being imposed for an improper purpose.

22. Bogadek v. Butovic, 336 Pa. 284, 9 A.2d 388, 389–390 (1939), citing Commonwealth v. Union League, 135 Pa. 301, 327, 19 A. 1030, 8 L.R.A. 195 (1890); Commonwealth v. Heilman, 241 Pa. 374, 378, 88 A. 666 (1913); Maloney v. United Mine Workers of America, 308 Pa. 251, 256–257, 162 A. 225 (1932); Lodge No. 19, Svete Ime Isusovo v. Svi Sveti, 323 Pa. 292, 185 A. 650 (1936); Raynovic v. Vrlinic, 334 Pa. 529, 6 A.2d 288 (1939); Varzaly v. Yuhasz, 128 Pa. Super. 314, 193 A. 63 (1937).

23. "The courts frequently declare that they will not reweigh the evidence before the union tribunal, but will look only to see if there is some evidence to support the finding of guilt. This language, however, is often but an apologetic prelude to a full re-evaluation of the evidence. * * *" Summers, *supra*, 70 Yale L.J. at 185.

Professor Summers suggests that the extent of judicial inquiry may depend upon the type of offense which is the subject of the discipline. Thus, where the disciplined member has been punished for communist activities, a financial offense, or an offense relating to the collective bargaining agreement, there is a tendency not to disturb the decision of the union tribunal. A more meticulous examination takes place where the type of offense relates to dual unionism, punishment for

In addition to the state court cases construing the meaning of a full and fair hearing before a union tribunal, there was extant at the time that the LMRDA was enacted, a large body of federal case law interpreting the meaning of a "full and fair hearing" as employed in other areas of federal concern.[24] These decisions compel the conclusion that the courts did not equate the requirement of "substantial evidence" with that of a "full and fair hearing".

Thus, in a case arising before the Administrative Procedure Act was passed, it was argued that a deportation order based on less than substantial evidence was inherently unfair and a denial of due process of law. The Supreme Court rejected this contention, stating:

"Deportation without a fair hearing or on charges *unsupported by any evidence* is a denial of due process * * * But a want of due process is not established by showing merely that the decision is erroneous * * * or that incompetent evidence was received and considered. Upon a collateral review * * * it is sufficient that there was *some evidence* from which the conclusion of the administrative tribunal could be deduced and that it committed no error so flagrant as to convince a court of the essential unfairness of the trial.

"The ultimate question * * * [is] whether the warrant of deportation was supported by any evidence. * * * * " [25]

Finally, we must examine the federal courts' understanding of the judicial inquiry under § 101(a) (5). A careful scrutiny of their holdings is required, since in many decisions the standard of

use of the courts, or action taken because of political activity.

See McGinley v. Milk & Ice Cream Salesmen, Etc., 351 Pa. 47, 40 A.2d 16, 18 (1944): "[W]here no evidence exists to support the charges * * * a finding of guilt * * * must be set aside;" and Williams v. National Organization Masters, 384 Pa. 413, 120 A.2d 896, 898 (1956): The court may determine whether union officers have "exercised their power arbitrarily, and may review the form of proceedings to see that the constitution and by-laws of the society were complied with, but cannot review the case on its merits."

24. Chin Yow v. United States, 208 U.S. 8, 28 S.Ct. 201, 52 L.Ed. 369 (1908); Kwock Jan Fat v. White, 253 U.S. 454, 40 S.Ct. 566, 64 L.Ed. 1010 (1920). The New England Divisions Case, 261 U.S. 184, 200, 43 S.Ct. 270, 67 L.Ed. 605 (1923), held that "[w]hether a hearing was full must be determined by the character of the hearing, not by that of the order entered thereon [speaking of the full hearing requirement of § 418 of the Transportation Act of 1920]. A full hearing is one in which ample opportunity is afforded to all parties to make, by evidence and argument, a showing fairly adequate to establish the propriety or impropriety, from the standpoint of justice and law, of the step asked to be taken. * * *

"An order of the Commission fixing rates, if unsupported by evidence, is clearly invalid * * * To consider the weight of the evidence, or the wisdom of the order entered, is beyond our province." *Id.* at 203–204, 43 S.Ct. at 279 (all citations omitted).

25. U. S. ex rel. Vajtauer v. Comm'r of Immigration, 273 U.S. 103, 106, 47 S.Ct. 302, 304, 71 L.Ed. 560 (1926) (all citations omitted, emphasis supplied). In United States ex rel. Lindenau v. Watkins, 73 F. Supp. 216, 219 (S.D.N.Y.1947), the court noted that: "At one time in habeas corpus proceedings brought to review the validity of a deportation order, the court was limited to considering the questions whether the immigration authorities acted within the provisions of the applicable statutes, whether they accorded to the alien a fair hearing, and whether their findings of fact were supported by any evidence * * * If there was any evidence whatever to sustain the findings of fact, they were not subject to further review by the courts. The law has been changed, however, by the recent Administrative Procedure Act, Act of June 11, 1946; 60 Stat. 237 et seq., Title 5 U.S.C.A. § 1001 et seq." (all citations omitted) " * * * the result is that in a * * * proceeding to review a deportation or exclusion order of the immigration authorities, it is not enough that there be some evidence to sustain the findings of fact. They must be supported by substantial evidence." *Id.* at pp. 219–220. (all citations omitted)

review espoused by the court often differs greatly from the scope of review actually exercised by the court.

In the leading case of Vars v. Int'l B'hd of Boilermakers, 320 F.2d 576 (2 Cir. 1963), it was emphasized that: (1) the court is not free to substitute its judgment for that of the union trial court; (2) the court must not reexamine the evidence to determine whether it would have arrived at the same conclusion reached by the trial body; (3) "implicit in the requirement of a full and fair hearing is the requirement that there be some evidence to support the charges made"; (4) "although the courts may be without power to review matters of credibility or of strict weight of the evidence, a close reading of the record is justified to insure that the findings are not without any foundation in the evidence." [26]

We believe these principles enunciate the proper and traditional scope of court review of internal union discipline proceedings as found in the better-reasoned federal and state decisions involving the question of whether there had been a full and fair hearing before the union tribunal. [27]

We now proceed to examine the evidence in light of the above standard.

The appellant is an international labor organization composed of various affiliated local unions and district councils. Mr. Lewis was president and business agent of appellant's Local No. 403, consisting of employees of the Highway Division of the Department of Streets of the City of Philadelphia. Local 403 is a member of District Council No. 33. This district council, composed of various locals of the appellant union, represents approximately 18,000 employees of the City of Philadelphia. In 1967, the district council and the city were functioning under the terms of a collective bargaining agreement which contained the provision: "There shall be no strikes, lockouts, or stoppages of work."

In accordance with the procedures established in the international union's constitution, plaintiff Lewis was notified in writing that he was charged with violation of this provision. The specific charges filed against him were: [28] four

26. 320 F.2d at 578.

27. For state court decisions, see cases cited, *supra*, in footnotes 20, 21, 22 and 23. In the Second Circuit the courts have followed the standard announced in *Vars:* Cole v. Hall, 339 F.2d 881 (2 Cir. 1965). *Vars* has also been accepted by the Fifth Circuit in International B'hd. of Boilermakers, etc. v. Braswell, 388 F.2d 193 (5 Cir. 1968), "some evidence to support the charges made". But in Allen v. International Alliance of Theatrical, etc., 338 F.2d 309 (5 Cir. 1964), the court did not reach the question of evaluating the evidence, holding that the member had not been charged with the specific offense under which he was in fact tried before the union tribunal, and accordingly was deprived of a "full and fair" hearing.

The following sampling is gleaned from the District Courts. Smith v. General Truck Drivers, Etc., 181 F.Supp. 14, 16 (S.D.Cal.1960): "[A fair hearing] * * * means only that before any action is taken against him he must be informed of the charges and be given an opportunity to hear them and refute them." Rosen v. District Council No. 9 of N. Y. City, 198 F.Supp. 46, 49 (S.D.N.Y.1961): "'[T]here is some evidence which must be accepted as giving a basis for the finding as made and this court is not free to substitute its judgment for that of the Union tribunal with respect to the sufficiency thereof.' Dakchoylous v. Ernst, 203 Misc. 277, 283, 118 N.Y.S.2d 455, 460 (1952)." Salzhandler v. Caputo, 199 F. Supp. 554, 556 (S.D.N.Y.1961): "'It is not for this court to reexamine the evidence in order to see whether it would have arrived at the same conclusion as did the Trial Board.'" Leonard v. M.I.T. Employees' Union, 225 F.Supp. 937, 939 (D.C.Mass.1964): evidence adduced at the trial board "may offer some basis for suspicion, but they fall short of being substantial evidence to support any finding * * *." Parks v. Int'l B'hd of Elec. Wkrs., 203 F.Supp. 288, 307 (D.C. Md.1962): "[Disciplinary proceedings] must be conducted in accordance with the requirements of due process. These requirements include the giving of adequate notice of the charges and a fair hearing to an accused member."

28. The procedures for filing and the hearing of such charges are set forth in elab-

charges of violating the International Constitution by willfully violating the "legally negotiated and approved collective bargaining agreement between District 33 and the City of Philadelphia" and the provisions of Council 33 constitution by "calling and directing a strike or work stoppage" on May 4, 1967 and May 18, 1967; and a fifth charge that he violated the international constitution by violating the "legally authorized decisions of Council 33" by his activities relating to the May 18th event.

The District Court, and the union's Judicial Panel, found as a fact that on May 4, 1967, Mr. Lewis "* * * by his physical presence as an obstruction in the driveway, individually [did] interfere with and delay the start of work at that location for approximately two hours." This finding was based on testimony that Lewis had gone to this particular location to protest the city's five-day suspension of a member of his local. By positioning himself in the driveway, none of the men could leave the yard to go to work; none did, in fact, go to work during the time he made his stand in the driveway. On the day before this particular incident Lewis is quoted as having said: "Nothing in that yard is going to shake. I'm going to have to close that yard down * * * I'm going to close that yard down tomorrow."

The Hearing Officer of the union concluded that not only was this a work stoppage but Lewis "was in sole command" of it, "that he refused to follow a well established grievance procedure" and "refused to abide by a written contract with the city of Philadelphia." The Judicial Panel affirmed the decision of the Hearing Officer and reaffirmed that Lewis was in sole command and "almost single handedly executed a work stoppage on May 4. * * * *"

Construing this same evidence, the District Court found that Lewis did not "order a work stoppage, although he did, by his physical presence as an obstruction in the driveway, individually interfere with and delay the start of work at that location for approximately two hours."

The next scene of the confrontation took place five days later when Lewis was called before the executive board of District 33. Here he "very reluctantly" gave assurance to the district officers that there would be no further work stoppages.[29] The interest of the district council was not purely an academic matter at this time; it was already the

orate detail in the international constitution. See Article X, §§ 1–31. The five charges were worded as follows:

"1. We charge that Frederick Lewis violated Article X, Section 2(F) of the International Constitution in that he willfully violated the legally negotiated and approved collective bargaining agreement between District Council 33 and the City of Philadelphia by calling and directing a strike or work stoppage on May 4, 1967.

2. * * * by calling and directing a strike or work stoppage on May 18, 1967.

3. * * * that Frederick Lewis under Article X, Section 2(A) of the International Constitution in that he violated Article VI, Section 4 of the Council 33 Constitution by calling and directing a strike or work stoppage on May 4, 1967.

4. * * * by calling and directing a strike or work stoppage on May 18, 1967.

5. We charge Frederick Lewis, under Article X, Section 2(E) of the International Constitution in that he violated the legally authorized decisions of Council 33 by calling and directing a work stoppage on May 18, 1967."

29. Testimony of W. J. McEntee, President of District Council:

"[Fred] Lewis was also told in no unspecific language that there should not be and could not be, and the council would not tolerate, any more work stoppages * * * Well, condensing the whole discussion the chair two or three times told Mr. Lewis to the effect that the district council wanted the assurance from Fred Lewis, the titular head of Local 403, that there would be no work stoppages in 403 unless he followed the channels in conformity with the constitution of District Council 33. And after quite a lengthy discussion, within the confines of this, very reluctantly Frederick Lewis did give that assurance to District Council 33."

recipient of a letter from the city pointing out that there had been a "work stoppage" in violation of the collective bargaining agreement.

A week after the meeting with District 33, Lewis presided over a meeting of the board of delegates of his local where it was agreed that "in sympathy with the [suspended member] they would suggest to their people to take a sick day, Thursday, May 18, 1967." [30] The following day, in the presence of some twenty members, Lewis was heard to advise a shop steward that "everybody is off tomorrow". On the next day, at least 248 members of Local 403, out of a total work force of 894, reported sick. In addition to these absent employees, who were marked "AWOL" by the city, there were another 120 employees of this group absent for legitimate reasons. Thus on this day the Highway Division of the Philadelphia Street Department operated at forty-one (41%) per cent capacity.

On this same day Lewis was heard to say to one city supervisor: I've got traffic closed, the asphalt division closed * * * and if you don't watch out I'm going to shut down the whole city"; to another administrator, that if the 248 AWOL employees were not paid for their day's absence, he "would declare war * * * that there would be violence, bricks and bats and sticks and stones would fly." Predictably, the city reacted. It reacted with a strong letter to District 33, reciting these incidents, reviewing its previous letter regarding Lewis, emphasizing that the "actions involving work stoppages caused by Mr. Lewis is a clear violation of the contract between the City and District 33", demanding an end to "irresponsible deportment and statements made by Mr. Lewis to management officials" and also demanding that appropriate action be taken by the union against him.

The union took action. Charges against Lewis were filed by officials of the council and eight affiliated locals with the Judicial Panel as provided in the Union's international constitution. A hearing was held by the Chairman of the Judicial Panel of the international union; Lewis was ordered expelled from the union; he appealed to the full Judicial Panel, and the panel upheld the decision of the Hearing Officer. It "deplored" his conduct in the May 4 incident and emphasized that he "participated in and actively supported the work stoppage of May 18, 1967, after making a commitment to the Executive Board of Council 33 that there would be no further work stoppages and such actions constituted a serious threat to the welfare of the Council, affiliated Local Unions and their members." [31]

By what words may we describe the activity of May 18? The City of Philadelphia called it a work stoppage. So did the officers of District 33 and eight affiliated local unions who preferred the charges; the union's hearing officer and Judicial Panel reached the same conclusion. Mr. Lewis, himself, indicated the same in an affidavit filed in another action.[32]

---

30. Excerpted from minutes of the meeting where Mr. Lewis functioned as president and secretary.

31. The decision of the Judicial Panel concluded:

"The work stoppages presented a severe threat to the contract between the Council and the City. The rights of several thousand members were directly affected and the possibility of legal action against the Council and the abrogation of the collective bargaining agreement were substantial and serious threats to the welfare and existence of the Council and its affiliated unions.

After the work stoppage of May 4th appellant promised not to participate or take part in any further stoppages. There was a continuing series of actions taken by appellant after he made such a promise. Members of nine Locals affiliated with the Council and two officers of the Council signed the charges. An organization must protect itself from the action of its members which present serious threats to the existence and the welfare of its members."

32. An affidavit filed in the District Court for the Eastern District of Pennsylvania,

But the District Court disagreed; it specifically found that the "absenteeism of May 18, 1967, did not constitute a work-stoppage or strike." This was a critical finding because the gravamen of the charges against Lewis was that he called or directed two stoppages even though such were forbidden under the terms of the collective bargaining agreement between the union and the city. The importance placed by the union on the integrity of the agreement is demonstrated by the provisions of its international constitution which state that a penalty for "willful violation of a legally negotiated and approved collective bargaining agreement" is expulsion from membership.

 We find that there was sufficient evidence before the union's Judicial Panel for it to have concluded that work stoppages did occur on May 4 and May 18, and the Lewis played no insignificant role in "calling and directing" them. To reach a contrary conclusion required the court below to exercise an authority of review greatly in excess of its limited and circumscribed power. Indeed, the court's conclusion that there were no work stoppages ran counter to the great quantity of evidence which preponderated against such a finding, and, in the very least, such a conclusion compelled the court to substitute its own judgment for that of the union's tribunal. No reviewing court has such prerogative.

 For the reasons set forth previously in great detail we have determined that the scope of review granted to a federal court under the LMRDA is a contracted and extremely limited

one. Once the court determines that the findings of the union's tribunal were "not without any foundation in the evidence," that the proof adduced related to appropriate charges, and that procedural due process was observed, the action of the union tribunal must be upheld. The court has no authority to enter into an evidence-weighing process and it may not substitute its judgment for that of the union tribunal.

We deem such a limitation to be vital if we are to prevent the federal courts from becoming a super-international trial board appeals tribunal antithetical to the concept of union self-determination as reflected in the spirit of our national labor policy.

We have gone to some extent to delineate precisely the proper scope of court review in such cases, even though we feel that the evidence which was presented before the appellant's union tribunal would have prevailed under a more expanded scope of judicial review, as for example, one that is to determine whether there was "substantial evidence on the record considered as a whole".[33] We have done this because, as previously noted, in reviewing the cases we have often detected fundamental differences between a court's articulation of the scope of review and its application of the announced standard. Although necessarily we must be bound by the intention of Congress in such cases, we have also concluded that sound judgment and policy give support to the Congressional directive.

Accordingly, the judgment of the District Court will be reversed and judgment entered in favor of the defendant.

Civil Action No. 47,068 stated: "The *stoppage* had neither the approval nor the encouragement of the Leadership of Highway Local 403" and that "[a] *work stoppage* had been discussed by the Board of Delegates of Highway Local 403 but it was not recommended" and that "Frederick E. Lewis did all within his power to prevent the *work stoppage*, and in fact encouraged the members to return to work." (emphasis supplied) See

also Minutes of the Board of Delegates of Local 403 of May 16 for a resolution ordering the "sick day" for May 18, and "Agreed by all present that one day would be sufficient," signed by Lewis as President and Secretary.

33. "Substantial evidence" is the minimum requirement to sustain findings of the National Labor Relations Board as amended by LMRDA of 1947.