**Billy Telford SMITH**

v.

**SHEET METAL WORKERS INTER-NATIONAL ASSOCIATION et al.**

**Civ. A. No. 7661.**

United States District Court, E. D. Tennessee, N. D.

May 9, 1972.

Harry J. Bryant, Knoxville, Tenn., for plaintiff.

E. H. Rayson, James A. Ridley, III, Kramer, Dye, Greenwood, Johnson, Rayson & McVeigh, W. P. Boone Dougherty, Knoxville, Tenn., for defendants.

MEMORANDUM

ROBERT L. TAYLOR, District Judge.

This matter is before the Court on cross motions for summary judgment. The case is an action for damages and reinstatement of plaintiff as an officer and member of defendant local union pursuant to the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. §§ 411-412.

Plaintiff was elected business manager of the local union on or about June 24, 1969. In addition to the business manager, this local has three business representatives. In February, 1970, plaintiff assigned each business representative to a specific geographic area and delegated to them authority to handle job assignments in their respective areas. (This construction trades labor union operates under the hiring hall concept with regard to the employment of its membership.) Shortly thereafter, friction developed between plaintiff and the business representatives, particularly defendant W. Lee Vanoer.

On May 7, 1970, a letter from the General President of the International Union was written and sent to officers of defendant local union, including plaintiff. The body of this letter states:

"This is with reference to your recent letter regarding the current problem existing in Local Union 51 with reference to the Business Manager and the Business Agents over jurisdiction of areas.

"Please be advised that under the Constitution the Business Manager is the coordinator of the Business Agents and has the authority to assign districts to each of the Business Representatives in the Local Union. Once the assignment is made all of the shops and jobs in those particular areas are under the supervision for policing of the Business Agent assigned to the respective territory.

"The Business Manager does not have any authority to pick and choose a shop or a job in any of the particular areas since these have been assigned to the Business Representative having jurisdiction of the specific territory. It is the function of the Business Manager, however, to coordinate all of these territories for the purpose of efficient operation of the Local Union and proper policing of work jurisdiction."

On August 24 and 26, 1970, charges were preferred against plaintiff. The letter of August 24, 1970, stated that the three charges were brought under Article Seventeen, Sections 1(b) and 1(m) of the International Constitution and then set them forth in detail as follows:

"(1) The letter of May 7, 1970, from General President Edward F. Carlough advising Local # 51 of the guidelines to be followed pertaining to the duties of the Business Manager and Business Representatives in the performance of their duties has not been adhered to. You have consistently violated the directions from the General President. You are continuing to send men out to local shops and jobs without the Business Representatives assigned to that area having any knowledge of this being done until a later date.

"(2) You signed a new three year agreement with John F. Humphreys Metal Fabricators. This was done before the membership had any knowledge of it or approved by the membership or Business Representatives.

"(3) On August 18, 1970, W. L. Vanoer, Business Representative of Local # 51, was physically assaulted by you in your office at 311 Morgan Street, Knoxville, Tennessee. This assault was witnessed by Roscoe W. Jones, International Representative of the Sheet Metal Workers International Association.

"We are respectfully requesting that the General President appoint an International Trial Board to hear these charges and reach a decision."

The letter of August 26, 1970, merely sets forth in greater detail the circumstances of the third charge.

The International Trial Board held a hearing on November 2, 3 and 4, 1970. All parties were permitted to produce, examine and cross-examine any witnesses they desired. On December 10, 1970, said Trial Board filed a forty-five page memorandum "Findings of Fact and Conclusions of Law." Plaintiff was found guilty on the first and third charges and acquitted on the second charge. On the first charge he was removed from his office as business manager, suspended from membership for one year, and fined five hundred dollars. On the third charge he was fined two hundred fifty dollars.

Plaintiff appealed the decision to the General President who affirmed the findings but modified the disciplinary measures. On the first charge he affirmed the removal from office, reduced the fine to two hundred and fifty dollars, and reduced the suspension from membership to ninety days. On the third charge, he suspended the fine. These actions were duly affirmed by the Executive Council of the International Union. Thus, the issue in this case is limited to the validity of the disciplinary measures imposed for plaintiff's alleged violation of the General President's directive of May 7, 1970.

The parties have stipulated the authenticity of a copy of the Constitution of the International Union, the transcript of the hearing before the International Trial Board, the decision of the International Trial Board, the decision of the International General President affirming the decision of the International Trial Board and modifying its disciplinary measures, and the decision of the International General Executive Council affirming the action of the International General President.

Plaintiff has moved for summary judgment on the ground that the transcript shows that he was denied the opportunity to introduce proof that his conduct was consistent with standard practices in other local unions of the defendant International Union as well as in Local 51 prior to his election as business manager. Defendants, Local No. 51 and W. Lee Vanoer, have moved for summary judgment on the ground that plaintiff received a "full and fair hearing" and that there is some evidence in the record to support the decision. The International's motion for summary judgment is in essence based on the same grounds. The ultimate legal question, common to all motions, is whether plaintiff received a full and fair hearing within the meaning of 29 U.S.C. § 411(a)(5) with respect to the alleged violation of the General President's directive of May 7, 1970.

■ Plaintiff was charged in charge one with engaging in conduct detrimental to the best interests of the Association, in violation of the International's Constitution, to-wit, violation of the General President's directive. Article Seventeen, Section 1(m). The International's Constitution provides that each local union shall have at least one business manager *or* business repersentative and may have additional business representatives. Article Twelve, Section 2. It also provides that "(b)usinessman-manager or business representatives *or both* shall represent their local unions . . . and supervise the conduct and activities of members . . . (etc.)." Article Thirteen, Section 9. These provisions fail to distinguish the relative rights and responsibilities of business managers and business representatives. Since the General President has the power to "decide all questions of order and usage . . . and . . . all constitutional questions," it would appear that his directive of May 7, 1970, should be binding on plaintiff. Article Three, Section 1. Consequently, the question is whether there is some evidence in the transcript that plaintiff violated the di-

rective. Lewis v. American Federation of State, County and Municipal Employees, 407 F.2d 1185 (C.A.3, 1969). If there is, he may be properly fined, removed from office or suspended. Article Seventeen, Section 1(a).

· The International Trial Board's written opinion had the following to say concerning these charges:

## "THE ISSUE

"We must decide whether Brother Smith from and after receipt of this letter complied with these guidelines, and, if he did not, whether failure to comply with them constituted a violation of Section 1($l$) or 1(m) of Article Seventeen (17) or both of said sections.

## "FACTUAL DETERMINATION AND ANALYSIS OF THE EVIDENCE

"The accused and his three Business Agents got together shortly before and shortly after General President Carlough mailed his guidelines letter, and, with the assistance and advice of International Representative Roscoe Jones, worked out a territorial allocation for each of the Business Agents. The final assignments were: Vanoer was assigned, to the Knoxville-Oak Ridge area; Ruel Ball was assigned to the Kingsport, Bristol, and Asheville, North Carolina, area; and Bernard Rose was assigned to the Chattanooga area. It was mutually agreed that the accused Business Manager was to be the "coordinator" of the Business Agents. This meant that the · accused could assign and reassign territories among the Business Agents but, at the same time, he was not to inject himself into the administration of contracts and job manning requirements in jobs in the territory of one of the Business Agents without first consulting with the Business Agent involved. The Business Agents were subject to supervision by the Business Manager, in other words, and could be requested or directed to carry out the Business Manager's instructions, but it was the Business Agent who was to police the job rather than the Business Manager.

"The insincerity of the accused in respect to this arrangement with the Business Agents was well illustrated by the testimony of International Representative Roscoe Jones. Jones, under cross-examination by the accused, stated that he and the accused had a conversation shortly after the meeting with the Business Agents in which they both concluded that the instructions issued by the General President did not prevent the accused from referring men to any job. In other words, the accused told his Business Agents that they would be in exclusive control of the jobs in their territories and that he would do nothing in regard to their jobs unless first advising and consulting with them; yet, he indicated to International Representative Jones that he felt he had the right and intended to exercise the right to refer men to jobs without such consultation if he so desired.

"The truce between the accused and his Business Agents was indeed short lived. The John F. Whelahan Company was a sheet metal contractor in Knoxville, in the territory assigned to Business Agent Vanoer. The accused without out consulting or advising Business Agent Vanoer, sent to work at the Whelahan Company Walter Whedbee on May 21, 1970, Lonnie Summerfield on May 25, 1970, and Howard Wood on May 28, 1970. When Vanoer asked Whelahan's superintendent, Snow Hudgins, about these hirings, he was told by Hudgins that they were hired at Smith's request and as a favor because Whelahan did not need any men at the time.

"Then, on August 5, 1970, Willie Stoner, a member of Local Union 51, was referred by the accused to a job at the Whelahan Company. Stoner had gone to Vanoer the day before to obtain a referral but had been refused because of insufficient work and a surplus of unemployed members with higher job priorities. Vanoer was not advised by the accused that Stoner was being referred to

the Whelahan Company for a job and he was shocked to find him at work there.

"James R. Everett and Lonnie Summerfield were referred by the accused to jobs at the Tri-State Roofing Company of Tennessee after the May 7 letter was received and after the "agreement" between the accused and his Business Agents as to their "territorial rights." These jobs were in Business Agent Vanoer's territory but the accused did not give him any notice of these referrals.

"Business Agent Ruel Ball testified about the employment of another sheet metal worker, Tom McLemore. The John F. Whelahan Company called Bell, who at the time was in Knoxville working with Business Agent Vanoer, to obtain McLemore, requesting him by name. Ball advised the Whelahan Company agent that McLemore was working on the Union Carbide job at Oak Ridge, Tennessee, and he could not be sent out. The accused, however, sent McLemore to the Whelahan Company within two days after the letter made the request to Ball —McLemore, meanwhile, quit his job at Union Carbide to go to work for the Whelahan Company—and, again, neither Ball not Vanoer was notified by Smith of the referral. Vanoer stated that they had decided not to send McLemore to the Whelahan Company because Union Carbide did not replace men who quit at that time. Thus the referral of McLemore to the Whelahan Company resulted in the net loss of a job opportunity during a period of chronic unemployment, when there were about .120 sheet metal workers unemployed in the Knoxville area.

"Billy Newell, the Local Union 51 conductor and a charging party, was once a close friend and associate of the accused, but later had a falling-out with him. Newell was employed in August of 1970 by Rust Engineering Company on the Atomic Energy Commission project at Oak Ridge, Tennessee. He was an assistant job steward. The Rust Engineering Company job was in Business Agent Vanoer's territory. The accused, without any prior consultation with

Vanoer, sent Rust Engineering Company a letter on August 17, 1970, in which he attempted to remove Newell from the position. The letter stated:

" 'Please be advised that I am replacing your now alternate and assistant Job Steward Billy W. Newell with G. G. Andrews.

"Mr. Schey, as I have talked with you in the past, if you do not feel that we need an assistant Job Stewart and only an Alternate Job Stewart, please let me know by letter and I will be glad to make a change.

" 'Any other personal business or otherwise I can do for you please let me know.

Yours very truly,
/s/ Billy T. Smith
Billy T. Smith
Business Manager'

"The officers of Rust Engineering Company refused to accept the change in Newell's status on the ground that the job was in Business Agent Vanoer's jurisdiction and such action would have to come from him.

"Breau Peace, the steward at the Rust Engineering Company job at Oak Ridge, testified that he was appointed to his position by the accused. The accused frequently came to the job and attempted to do whatever he could to embarrass Business Agent Vanoer. Peace testified that Smith asked him to stir up as much jurisdictional trouble as he could but to withhold the information as to the trouble from Vanoer for as long as possible. Peace stated that to his knowledge the accused constantly called Rust Engineering Company's supervision to tell them he has heard that the sheet metal workers are not doing their work properly. He did so, according to Peace, solely to create trouble on the job.

"Business Agent Vanoer described the atmosphere at the Rust Engineering Company project in the following terms:

" ' . . . He is constantly, Bill Smith is constantly going out and he's got the company out there, Russ

(Rust) Engineering, the company tore up that they are—they actually don't know which one that is representing the union of the Sheet Metal local and from time to time they asked me, Vanoer, said, are you sure it is under your control. I said yes, this is what I understand from the letter we got from the General President. And Walt Shay, he is directly over the sheet metal superintendent, Harold Green out there and I think that Walt Shay has listened to Bill enough—he has told me time and time again that the sheet metal workers was in the worst shape now that he's ever seen them before. And thats on account of Bill Smith constantly going out there and stirring up trouble, getting rumors going about Lee Vanoer did this or Lee did that.'

"Business Agent Rose testified about an occasion in September of 1970 when the Bowater Engineering Company called for some men at the Bowater plant. The Bowater plant is a paper mill located about half way between Chattanooga and Knoxville.

"Although the job was in Rose's territory, he did not have the acute unemployment in Chattanooga that Business Agent Vanoer was experiencing in Knoxville. So Rose sent out a few men from Chattanooga and called Vanoer in Knoxville to let him supply the rest from his area. On the day the men were to report for work, at the Bowater plant, there were two men too many. The extra men had referral slips issued by the accused. The accused, again, did not contact Rose or Vanoer to advise that he too was referring men to the job. The result was that Rose had to send two of his Chattanooga men, Vernon Fugate and Darel Tripplett, off the job.

"There is more testimony in the record of the case which could be summarized but it would serve mainly to prolong our opinion. Suffice it to say that the accused really did not dispute most of the facts which have been related above. He readily admitted sending the various men to jobs without first clearing the action with the Business Agent in charge of the territory but said that he did this because the requests were of an emergency nature and came at a time when the Business Agent in charge was unavailable or that he was opposed to unemployment for his members and did what he could to obtain work for them.

"The heart of the accused's defense, however, seems to be his belief that pursuant to Article Thirteen (13), Section 9, of the International Constitution he had the right to refer men to any jobs and was not required to work with or through his Business Agents in this regard. That section provides:

" 'Business managers or business representatives or both shall represent their local unions and the members thereof in matters pertaining to collective bargaining agreements, wages, hours, conditions of employment and jurisdictional matters and supervise the conduct and activities of members in connection therewith to the end that the provisions of this Constitution and the policies of this Association are complied with; assist and cooperate with the officers of local unions and the members thereof in carrying out the provisions of this Constitution; use their efforts to adjust and settle such controversies as may arise in connection with complaints of members, consistent with the rights of those involved, in accordance with the provisions of this Constitution and the policies of this Association.

" 'In all matters involving jurisdiction of work, business managers and business representatives shall recognize, protect and be governed by the jurisdictional claims and rights of the Association as set forth in Article One (1), Section 5 of this Constitution and shall not waive or relinquish claim to any work specified therein.'

## "DISCUSSION

"It seems obvious to us that Article Thirteen (13) Section 9, of the International Constitution, does not provide a basis for contending that a Business Manager can take over the duties of his Business Agents by injecting himself into the day-to-day administration of the agreements in their territorial jurisdiction. To do this only creates a chaotic condition in the area, with the management representatives in doubt as to with whom they may responsibly deal. Moreover, it plainly creates dissension and hard feelings among the Business Agents and destroys their rapport with the members within their territorial jurisdiction.

"We cannot believe the accused when he stated that a substantial number of the disputed job referrals were made by him because the Business Agent in charge was unavailable at the time and the work was of an emergency nature. First of all, the unavailability of Business Agent Vanoer, who was the one who was said to be unavailable in the evening, was flatly denied, and we credit Vanoer here rather than the accused. We discredit the accused on this point, in part, because the accused not only gave referrals to jobs in Vanoer's area in this reputed absence but thereafter failed to notify Vanoer of the referrals he had made. If the accused was trying to cooperate with Vanoer, he surely would have advised Vanoer of the referrals made in his absence, so that Vanoer would know what had been done, and where his men were.

"Next, the accused's statement that he was opposed to unemployment for his members and did what he could to obtain work for them is almost frivolous in these circumstances. The issue was not eliminating unemployment for sheet metal workers; the accused, the three Business Agents, and all of the local union officers were united in attempting to find jobs for unemployed members. The position of Business Agent Vanoer, and Agents Ball and Rose as well was

that the Local Union 51 members should be referred out for work in some sort of chronological order corresponding to the length of their periods of unemployment. The accused, on the other hand, appeared to have his particular group of favorites or friends who would get work referrals entirely out of the order felt to be fair and appropriate by the Business Agents. The accused, in other words, was playing favorites and using referrals for political purposes and to create dissension and discord.

"It is demoralizing, to say the least, for a union member to obtain a work referral from a Business Agent only to find that the vacancy has been filed by a conflicting referral from the Business Manager. Inasmuch as it is self-evident that repeated instances of such 'rank pulling' by the Business Manager, especially when the Business Agent is not even notified of the action, can only create unrest and dissension in the local union, we believe the accused by resorting to such tactics intended precisely such result. The letter of May 7, 1970, from General President Carlough which further clarified the scope of Article Thirteen (13) only corroborates our view that a Business Manager is a 'coordinator' which we construe to mean a 'harmonizer' rather than a 'saboteur.'

"The evidence in the case, viewed in the light most favorable to the accused, when all of the rumors and evidence of cloak-and-dagger machinations are removed from consideration, still overwhelmingly establishes a violation of Article Seventeen (17), Section 1(m). The accused, as Business Manager of Local Union 51, engaged in conduct which was detrimental to the best interests of the International Association as well as Local Union 51 by failing even to attempt to cooperate with his executive board and setting out to undermine and destroy the status of his three Business Agents, and particularly Business Agent Vanoer. We are mindful of the fact that the Oak Ridge facility is located within the jurisdiction of Local Union 51, and that highly important work is

performed at that location under the auspices of the Atomic Energy Commission. One of the International's own International Representatives, Roscoe Jones, is constantly involved on problems at Oak Ridge, which means that the prestige of the International Association is to some degree at stake here. The derelictions on the part of the accused as Business Manager of Local Union 51 thus tended to bring into disrepute the good names of both the International Association and Local Union 51.

"DECISION IN THE REFUSAL TO FOLLOW GUIDELINES CASE

"For the reasons given, we find Brother Billy T. Smith guilty of violating Article Seventeen, Section 1(m) of the International Constitution."

The transcript contains approximately 700 pages. At the end the Chairman of the Trial Board asked: "Have you both completed the case?" Plaintiff replied, "Yes."

█ The transcript of the hearing on these charges has been reviewed. We find that it contains substantial evidence to support the findings of the International Trial Board. The contention made in the plaintiff's brief that plaintiff was denied legal assistance is without merit. All of the parties were denied legal counsel in the hearing before the Board. This was in accordance with the requirement of the International Union Constitution. All of the parties were permitted assistance of another Union member as counsel, which right was exercised. Mr. Mull acted as counsel for Mr. Smith. A Union member is not denied any statutory or constitutional rights by denial of legal counsel in such a hearing. Cornelio v. Metropolitan District Counsel, 243 F.Supp. 126, 129 (E.D.Pa., 1965).

Accordingly, it is ordered that the plaintiff's motion for summary judgment be, and the same hereby is, denied. It is further ordered that the defendants' motions for summary judgment be, and the same hereby are, granted.