RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0265p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

JOHN W. BABLER; VICTOR BAFFONI; JAMES
R. CUMBY; JOHN D. FITZGERALD;
CONSTANTINO A. IANNONE,
                *Plaintiffs-Appellees*,

    *v.*

MALCOLM B. FUTHEY, JR., Individually and
in his official capacity; EXECUTIVE BOARD OF
THE UNITED TRANSPORTATION UNION; JAMES
HUSTON, Individually and in his official
capacity; JOHN RISCH, Individually and in his
official capacity; JOSEPH BODA, JR.,
Individually and in his official capacity;
STEPHEN T. DAWSON, Individually and in his
official capacity; KEVIN GORING, Individually
and in his official capacity,
                *Defendants-Appellants*.

No. 09-4455

> Appeal from the United States District Court
> for the Northern District of Ohio at Cleveland.
> No. 08-00912—John R. Adams, District Judge.

Argued: June 15, 2010

Decided and Filed: August 25, 2010

Before: SILER and GIBBONS, Circuit Judges; REEVES, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Joseph Guerrieri, Jr., GUERRIERI, CLAYMAN, BARTOS & PARCELLI, P.C., Washington, D.C., for Appellants. Joyce Goldstein, GOLDSTEIN GRAGEL, LLC, Cleveland, Ohio, for Appellees. **ON BRIEF:** Joseph Guerrieri, Jr., Elizabeth A.

_____

[*]The Honorable Danny C. Reeves, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Roma, Jeffrey A. Bartos, GUERRIERI, CLAYMAN, BARTOS & PARCELLI, P.C., Washington, D.C., Charles R. Both, LAW OFFICES OF CHARLES R. BOTH, Washington, D.C., for Appellants.  Joyce Goldstein, Gina Fraternali, GOLDSTEIN GRAGEL, LLC, Cleveland, Ohio, for Appellees.

––––––––––––––

**OPINION**

––––––––––––––

SILER, Circuit Judge.  This appeal is brought under the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 *et seq.* ("LMRDA").  Defendants Malcolm B. Futhey, Jr., the United Transportation Union ("UTU") Executive Board, James Huston, John Risch, Joseph Boda, Jr., Stephen T. Dawson, and Kevin Goring (collectively "Defendants") appeal the district court's grant of a preliminary injunction in favor of Plaintiffs John W. Babler, Victor Baffoni, James R. Cumby, and Constantino A. Iannone (collectively "Plaintiffs").[1]  Because we conclude that the district court did not abuse its discretion in granting the preliminary injunction, we affirm.

**BACKGROUND**

The UTU is a labor union representing the operating employees of freight and passenger railways.  This litigation arises out of a power struggle among UTU international officers relating to the UTU's proposed merger with the Sheet Metal Workers International Association ("SMWIA").  In 2004, Paul Thompson became the international president of the UTU.  Upon taking office, Thompson explored the possibility of merging the UTU with another labor union in an effort to bolster its bargaining strength and political influence.  The UTU ultimately entered into negotiations with the SMWIA.  In June 2007, Thompson presented a proposed merger agreement between the UTU and the SMWIA at the UTU's regional meeting.  The merger agreement stated that the two entities would merge to become the International Association of Sheet Metal, Air, Rail, and Transportation Workers ("SMART").

––––––––––––––

[1]Plaintiff John D. Fitzgerald is not a party to this appeal.

SMART would have a new constitution which would essentially be the SMWIA's constitution with the UTU's constitution appended and would be governed by officers from both of the former unions. The UTU's board of directors listened to Thompson's presentation and voted to submit the merger agreement to the UTU membership for their approval in accordance with the UTU constitution.

Pursuant to the merger agreement and the UTU's constitution, the proposed merger and the SMART constitution had to be approved by the UTU membership. The UTU constitution stipulates that the membership be provided with copies, by mail, of any agreements or merger documents that they were asked to ratify in a referendum. The UTU membership received an initial email that summarized the merger agreement and a later mailing that contained the merger agreement, supporting materials, and instructions for telephone and electronic voting. The UTU constitution and the SMWIA constitution were not included in the mailing sent to the UTU members, but both were posted on the UTU's website throughout the voting period. Although it was referred to in the merger agreement, a final version of the SMART constitution was not provided to the UTU membership before the merger was voted on. The merger was ultimately approved on a vote of 8,625 to 3,472.

From August 13 to August 17, 2007, the UTU held its quadrennial convention, where UTU international officers were elected and amendments to the UTU constitution were considered. In anticipation of the merger being consummated, the UTU's election process was modified. Rather than electing the customary fifteen international vice presidents, only nine international vice presidents were elected at the convention. The UTU membership also chose a new international president, assistant president, general secretary and treasurer, and national legislative director. These officers were to become SMART vice presidents when the merger was consummated.

On December 3, 2007, Dale Edward Michael, John R. Hasenauer, Roy G. Arnold, and Jimmy D. Eubanks (collectively "*Michael* Plaintiffs") filed suit against Thompson and the UTU in the Southern District of Illinois, claiming that the pending merger with the SMWIA was unlawful because the UTU membership was not given

sufficient information with which to evaluate the implications of the merger. The *Michael* Plaintiffs sought declaratory and emergency injunctive relief. The case was later transferred to the Northern District of Ohio, where the UTU is headquartered.

Shortly after the suit was filed, the officers who were elected at the UTU convention took office, with Futhey succeeding Thompson as international president. The *Michael* Plaintiffs petitioned the district court to substitute Futhey for Thompson as a defendant. Futhey had previously indicated that he was favorably disposed to the *Michael* Plaintiffs' position as he had submitted a declaration on their behalf and expressed opposition to the merger process. In reaction to this motion, John W. Babler, Victor Baffoni, Roy G. Boling, James R. Cumby, John D. Fitzgerald, Constantino A. Iannone, and James M. Brunkenhoefer (collectively "*Babler* Plaintiffs")–all of whom supported the merger–moved to intervene in the case because they were concerned that Futhey would not defend the merger against the *Michael* Plaintiffs' claims. The district court ultimately substituted Futhey for Thompson and granted the *Babler* Plaintiffs' motion to intervene.

On June 26, 2008, the district court granted the *Michael* Plaintiffs' motion for a preliminary injunction to restrain the UTU from consummating the merger with the SMWIA. This preliminary injunction was appealed to the Sixth Circuit. On December 22, 2009, our court issued three separate opinions, with the court reaching the result of reversing the district court's grant of the preliminary injunction and dismissing the action.

While the appeal in the *Michael* litigation was pending, several union members filed internal union charges against the *Babler* Plaintiffs. The charges brought against the *Babler* Plaintiffs alleged violations of the UTU constitution and included a request that the *Babler* Plaintiffs have their UTU membership revoked. At the time these charges were filed, Babler, Baffoni, Boling, Cumby, Fitzgerald, and Iannone held elected union office as international vice presidents and members of the board of directors. Brunkenhoefer held the elected office of national legislative director and also served on

the board of directors.  The *Babler* Plaintiffs claim that, at the time, they represented a voting majority of the board of directors.

In response to the internal union charges and pursuant to the LMRDA, the *Babler* Plaintiffs filed this suit against Futhey, the UTU Executive Board and its members, and the UTU members who filed the internal union charges against them.  On January 12, 2009, the *Babler* Plaintiffs filed their initial motion for injunctive relief to preclude the UTU executive board from conducting an internal union trial, alleging that the charges were retaliatory and would violate the LMRDA by chilling free speech and preventing union members' free participation in litigation.  On February 2, 2009, the district court denied the *Babler* Plaintiffs' initial motion for a preliminary injunction without prejudice to renewing the motion after the conclusion of the disciplinary trial.

The executive board held the internal union trial in February and May 2009.[2]  On July 10, 2009, the executive board issued its opinion, finding that Plaintiffs, acting as officers of the UTU, had violated Articles 16, 18, 23, and 28 of the UTU's constitution.  Articles 16 outlines the duties of the international president.  The executive board found that Plaintiffs violated Article 16 by seeking to usurp the international president's authority by acting in conjunction with the SMWIA to oppose his policies with respect to the merger.  Article 18 outlines the duties of international vice presidents.  The executive board found that Plaintiffs violated Article 18 by failing to carry out presidential directives and taking a different position than the international president in the *Michael* litigation.  Article 23 outlines the duties of the board of directors, which include the power to consider and implement plans of unification, affiliation, or merger with another labor union.  The executive board found that Plaintiffs violated Article 23 by exceeding their authority to determine UTU policy in connection with the merger.  Article 28 prohibits UTU officers, members, and subordinate bodies from resorting to civil courts until all appeals have been made in accordance with the UTU constitution.  The executive board found that Plaintiffs improperly resorted to opposing the

---

[2]Fitzgerald resigned prior to the commencement of the internal union appeal.

international president's policy decision in court rather than first pursuing any appeal rights they may have had within the union.

The executive board's key findings are summarized as follows in its opinion:

On January 1, 2008, Mike Futhey took office and determined that the *Michael* litigation should be settled and that the membership should have a new ratification vote after the negotiation of the SMART Constitution. . . . Despite the newly announced UTU policy, on January 16, 2008, you filed a Motion to Intervene in the *Michael* case. . . . Under Article 28 of the UTU Constitution, you should not have resorted to the Court in opposition to President Futhey's policy. . . . As officers, you were obliged to pursue your appeal rights within the Union *before* proceeding to the Court. Each of you knew or should have known that taking a position in federal court contrary to the President of our union and dealing directly with another union without the consent of the President went far beyond your free speech rights or ability to dissent. . . . The crux of this matter is your incorrect interpretation of the UTU Constitution. . . . Only the President may interpret the Constitution. Your persistent effort to expand your role under Article 23 and to usurp the proper prerogatives of the President make evident your failure to faithfully carry forward the policy of the UTU. . . . Each of you violated your oath of office in failing to carry out Presidential directives, and as officers, not as members, taking a position different than that of the President and the UTU both with the SMWIA and in litigation. Moreover, by taking money from SMWIA to litigate against your own union as officers, you are not fulfilling your fiduciary duty and oath of undivided loyalty to the UTU.

The executive board was careful to stipulate that its decision should not be construed as restricting a member's right to challenge and debate a policy of the Union. Rather, the executive board indicated that only officers were under a heightened obligation to fully support the policies of the UTU as articulated by the international president. Having determined that Plaintiffs had violated the UTU constitution, the executive board removed them from their elected offices. The UTU filled Plaintiffs' positions by elevating a number of assistant vice presidents.

On July 17, 2009, Plaintiffs renewed their motion for a preliminary injunction. The district court granted Plaintiffs' motion and ordered the UTU to restore Plaintiffs to their union offices. Defendants then filed this timely appeal.

**STANDARD OF REVIEW**

The court reviews a district court's decision regarding a preliminary injunction for an abuse of discretion. *USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 98 (6th Cir. 1982). The district court considers and balances four factors in making its decision: "(1) whether the plaintiff[s] [have] established a substantial likelihood or probability of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff[s]; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting injunctive relief." *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007). Under this standard, the court reviews the district court's legal conclusions de novo and its factual findings for clear error. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007). The district court's determination regarding the plaintiffs' likelihood of success on the merits is a question of law and is reviewed de novo. *Id*. "However, the district court's ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief is reviewed for abuse of discretion." *Id*. (internal citation omitted).

**DISCUSSION**

We will analyze the preliminary injunction factors to determine whether the district court's balancing of these factors constituted an abuse of discretion.[3] *See Hamilton's Bogarts, Inc.*, 501 F.3d at 649.

**A. Probability of Success on the Merits**

"The LMRDA was the product of congressional concern with widespread abuses of power by union leadership." *Sheet Metal Workers' Int'l Assoc. v. Lynn*, 488 U.S. 347, 352 (1989) (internal quotation marks omitted). Title I of the LMRDA, the "Bill of Rights" for union members, was "designed to guarantee every union member equal voting rights, rights of free speech and assembly, and a right to sue." *United*

---

[3]Defendants' argument that the district court committed legal error by applying the wrong legal standard is not supported by the record.

*Steelworkers of Am. v. Sadlowski*, 457 U.S. 102, 109 (1982).  These provisions of the LMRDA were calculated to provide "enlarged protection for members of unions paralleling certain rights guaranteed by the Federal Constitution." *Finnegan v. Leu*, 456 U.S. 431, 435 (1982).  In providing these protections, "Congress sought to further the basic objective of the LMRDA: 'ensuring that unions [are] democratically governed and responsive to the will of their memberships.'" *Lynn*, 488 U.S. at 352 (quoting *Finnegan*, 456 U.S. at 436).

Plaintiffs allege that, by discharging them from their elected union offices, the UTU executive board chilled their free speech rights, guaranteed by 29 U.S.C. § 411(a)(2), and retaliated against them for exercising their right to sue, guaranteed by 29 U.S.C. § 411(a)(4).  Defendants counter that the disciplinary proceedings were a reasonable exercise of the union's authority to adopt and enforce reasonable rules, pursuant to 29 U.S.C. § 411(a)(2), and to require members to exhaust reasonable hearing procedures, pursuant to 29 U.S.C. § 411(a)(4).[4]

29 U.S.C. § 411(a)(2) provides, in pertinent part:

> Every member of any labor organization shall have the right . . . to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, . . . upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided*, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining

---

[4]Defendants' argument that the executive board's disciplinary action is entitled to judicial deference if it is supported by "some evidence" misapplies that standard of review.  In *Int'l Bhd. of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers, and Helpers v. Hardeman*, the Supreme Court concluded that the "full and fair hearing" provision of 29 U.S.C. § 411(a)(5) requires "the charging party to provide some evidence at the disciplinary hearing to support the charges made."  401 U.S. 233, 246 (1971).  The "some evidence" standard of review is applied when, pursuant to 29 U.S.C. § 411(a)(5), a due process or sufficiency of the evidence challenge is made to a union disciplinary proceeding.  *See id.*; *see also Mayle v. Laborer's Int'l Union of N. Am.*, 866 F.2d 144, 146 (6th Cir. 1988) ("[U]nion discipline is presumed lawful so long as the charging party presents 'some evidence' that the member has committed the charged offense.").  This case does not present a due process challenge to the UTU disciplinary proceedings; rather, Plaintiffs claim that the disciplinary proceedings were invalid because they violated the free-speech and right-to-sue provisions of the LMRDA.  Consequently, the "some evidence" standard is inapplicable to this case.  *See Lynn*, 488 U.S. at 353-55 (noting that the Supreme Court did not apply the "some evidence" standard in that case).

from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. § 411(a)(4) provides, in pertinent part:

> No labor organization shall limit the right of any member thereof to institute an action in any court . . . irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding . . . : *Provided*, That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof: *And provided further*, That no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition.

In *Finnegan*, the Supreme Court addressed the question of whether the discharge of *appointed* union officials by the union president, following his election over the candidate supported by the appointed officials, violated the LMRDA. 456 U.S. at 432. The Supreme Court concluded that the overriding objective of the LMRDA was to promote union democracy and that it was not intended to address the issue of union patronage. *Id*. at 442. Consequently, the Supreme Court held that the discharge of a union employee from an appointed office did not violate the LMRDA. *Id*.

However, in *Lynn*, the Supreme Court addressed the question of whether removal of an *elected* union official, in retaliation for statements he made at a union meeting in opposition to a dues increase sought by the union trustee, violated the LMRDA. 488 U.S. at 349. Distinguishing *Finnegan*, the Supreme Court reasoned that the consequences of removing an elected official from office are much different than the consequences of removing an appointed official. *Id*. at 355.

> To begin with, when an elected official . . . is removed from his post, the union members are denied the representative of their choice. . . . Furthermore, the potential chilling effect on Title I free speech rights is more pronounced when elected officials are discharged. Not only is the fired official likely to be chilled in the exercise of his own free speech rights, but so are the members who voted for him.

*Id.* Moreover, the overriding objective of the LMRDA, to promote union democracy, would be thwarted if union members "concluded that one challenged the union's hierarchy, if at all, at one's peril." *Id.* Consequently, the Supreme Court held that the retaliatory removal of an elected union official from office stated a cause of action under the LMRDA. *Id.*

In this case, the executive board's disciplinary opinion boils down to an indictment of Plaintiffs for taking a different position in litigation than the international president with respect to the merger. The factual similarity between this case and *Lynn* suggests that Plaintiffs have a high probability of success on the merits. Both cases involve elected union officers who were discharged for opposing union policies. Although *Lynn* involved a violation of the LMRDA's free-speech provision and this case involves both alleged violations of the LMRDA's free-speech and right-to-sue provisions, the principles articulated in *Lynn* are equally applicable in both contexts. *See Gilvin v. Fire*, 259 F.3d 749, 759-60 (D.C. Cir. 2001) ("Although *Lynn* itself involved § 101(a)(2), there is no reason to suspect that its principles are not equally applicable to § 101(a)(4)."). Moreover, the executive board's reasoning that, as UTU officers, Plaintiffs had a special duty to support the policies of the international president even if they might have personally opposed those policies, contravenes the Supreme Court's reasoning in *Lynn*. *See Lynn*, 488 U.S. at 355 ("[T]he potential chilling effect on Title I free speech rights is more pronounced when elected officials are discharged. Not only is the fired official likely to be chilled in the exercise of his own free speech rights, but so are the members who voted for him."). The LMRDA was intended to promote union democracy, with all of its inefficiencies, and not centralized union governance, with all of its advantages. *See id.* ("[D]emocracy would be assured only if union members are free to discuss union policies and criticize leadership without fear of reprisal." (quoting *Sadlowski*, 457 U.S. at 112)).

The overarching context of Plaintiffs' removal from their elected offices is the power struggle within the UTU international leadership set off by the district court's preliminary injunction of the merger in the *Michael* litigation. This power struggle is

essentially a constitutional crisis regarding the division of power between the international president and the board of directors as it relates to mergers. Both sides have reasonable arguments in this debate. Article 16 of the UTU constitution provides the international president with broad authority to set UTU policy. However, Article 23 is the only constitutional provision that mentions mergers, and it gives the board of directors authority to consider and implement plans of merger with another labor union. The UTU constitutional provisions for extraordinary situations divide power between the international president and the board of directors. Under Article 16, the international president has authority to "interpret all laws of the organization, decide all questions arising there from, and decide all other controversies not provided for under the existing laws of the organization, *subject to appeal to the Board of Directors*." Similarly, Article 38 states that "[t]he International President, *with the approval of the Board of Directors*, may take such action as may be deemed necessary to meet situations not covered in this Constitution."

The executive board attempted to resolve this constitutional crisis by ruling that it is an offense, punishable by removal from office, for international vice presidents, who also happened to represent a voting majority of the board of directors, to take a position different from that of the international president. It is well established that courts are reluctant "to substitute their judgment for that of union officials in the interpretation of the union's constitution, and will interfere only where the official's interpretation is not fair or reasonable." *Vestal v. Hoffa*, 451 F.2d 706, 709 (6th Cir. 1971). However, in the novel context of a disputed merger, it is unfair and unreasonable to employ disciplinary proceedings to resolve a fairly close question regarding the proper allocation of power among UTU international officers. This is the type of abuse of power by union leadership that the LMRDA was passed to remedy. *See Lynn*, 488 U.S. at 352.

That Plaintiffs were retaliated against for exercising their LMRDA rights is clearly evidenced by the executive board's justification for its disciplinary actions. For example, the executive board cannot plausibly claim that it was simply exercising the union's prerogative under 29 U.S.C. § 411(a)(2) to adopt and enforce reasonable rules

governing the responsibilities of its members. Unlike *Sadlowski*, where a rule enacted by a union to prohibit candidates for union office from accepting campaign contributions from nonmembers did not violate 29 U.S.C. § 411(a)(2), this case does not involve a clear violation of a pre-existing union rule. *See Sadlowski*, 457 U.S. at 104-05, 121; *see also* 29 U.S.C. § 411(a)(2) (noting that "reasonable rules" must also be "established"). Rather, the executive board removed Plaintiffs from elected offices after determining, in a post hoc interpretation of rather vague constitutional provisions, that Plaintiffs had unconstitutionally usurped the authority of the international president. Moreover, it was cynical for the executive board to discipline Plaintiffs on charges of dual unionism for accepting financial assistance for litigation expenses from the SMWIA when the UTU was in the midst of a merger with the SMWIA, especially because there is no clear prohibition against or definition of dual unionism in the UTU constitution. *See* 29 U.S.C. § 411(a)(4) (noting that another union is not an "interested employer or employer association"). Finally, it was disingenuous for the executive board to discipline Plaintiffs for failing to pursue their internal appeal rights before proceeding to federal court. There was nothing for Plaintiffs to internally appeal. Indeed, Plaintiffs did not initiate the *Michael* litigation; rather, they intervened in the litigation to defend the merger after other UTU members initiated a suit to enjoin the consummation of the merger. Thus, the executive board's disciplinary action against Plaintiffs is not entitled to deference because it was not a fair or reasonable exercise of the union's disciplinary authority. *See Lynn*, 488 U.S. at 355; *Vestal*, 451 F.2d at 709.

The factual similarities between this case and *Lynn* are compelling. The executive board's decision to remove Plaintiffs from their elected offices for intervening in the *Michael* litigation and opposing the international president's policies is the type of anti-democratic action the LMRDA was intended to remedy. Thus, Plaintiffs have a high probability of success on the merits of their LMRDA claims.

**B.  Threat of Irreparable Harm to Plaintiffs**

The district court identified the following threats of harm to Plaintiffs caused by their removal from office by the executive board: (1) monetary loss; (2) loss of reputation and goodwill within the union; and (3) the chilling effect on Plaintiffs' willingness to exercise their LMRDA rights.  "The key word in this consideration is irreparable.  Mere injuries, however substantial in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (internal quotation marks omitted).

Lost wages are readily compensable and do not constitute irreparable harm. *Id.* at 90-91.  The threat of irreparable harm as a result of loss of reputation and goodwill appears genuine, but it is difficult to assess based on the record.  *See id.* at 91. Nevertheless, the potential chilling effect on the guarantees of free speech and the right to sue provided in the LMRDA constitutes a clear threat of irreparable harm to the Plaintiffs. *See Lynn*, 488 U.S. at 353-55.  Thus, the district court did not clearly err in finding that Plaintiffs face a threat of irreparable harm.

**C.  Substantial Harm to Others**

The district court determined that the preliminary injunction would not constitute a hardship to those individuals who filled Plaintiffs' offices after they were discharged, because they would not have had a reasonable expectancy of holding the office of international vice president.  It also determined that preliminarily enjoining the executive board's actions would undermine the UTU's right to govern itself and protect its membership.  Nevertheless, the district court ultimately concluded that the harm to Defendants was outweighed by the threat of substantial harm to UTU members caused by the potential chilling effect on their willingness to exercise their LMRDA rights. *See id.*

The harm to the UTU's governing institutions is real. A preliminary injunction tends to undermine the legitimacy of the executive board; it calls into question the division of authority among the UTU's international leaders, and it highlights the deficiencies of the UTU's governing bodies to effectively deal with an organizational crisis. With that said, the harm to the legitimacy of the executive board appears to be well deserved. Moreover, the identified harms to the UTU organization are of the variety that carry the potential of being a precursor of constructive organizational change. At any rate, the district court did not clearly err in determining that the harm to Defendants and others is outweighed by the threat of substantial harm to UTU members caused by the potential chilling effect on their willingness to exercise their LMRDA rights. *See id.* at 355.

### D.  The Public Interest

The district court did not making any clear factual findings regarding whether the public interest would be served by granting injunctive relief, but it did conclude a risk of harm to the union, or to the public, pales in comparison with the risk to Plaintiffs' individual rights. The overarching public interests at stake in this dispute are the policies that the courts should: (1) abstain from interfering with the internal management of labor unions, and (2) protect fundamental rights of individual labor union members as set forth in the LMRDA. *See Sewell v. Grand Lodge of the Int'l Assoc. of Machinists & Aerospace Workers*, 445 F.2d 545, 546 (5th Cir. 1971). Based on the facts of this case, the public interest weighs in favor of protecting Plaintiffs' individual rights as set forth in the LMRDA.

### E.  Balancing Preliminary Injunction Factors

Plaintiffs have a high probability of success on the merits of their LMRDA claims. The threat of irreparable harm to Plaintiffs, including the potential chilling effect on the guarantees of free speech and the right to sue provided in the LMRDA, is clear cut and strongly weighs in favor of granting preliminary injunctive relief. The harm to Defendants and others is outweighed by the threat of substantial harm caused by the

potential chilling effect on UTU members' willingness to exercise their LMRDA rights. The public interest weighs in favor of protecting Plaintiffs' individual rights over noninterference with the internal management of the UTU.  Thus, the district court did not abuse its discretion in granting Plaintiffs' motion for a preliminary injunction.

AFFIRMED.