**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a1040n.06

No. 10-1543

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Sep 28, 2012*
DEBORAH S. HUNT, Clerk

JERRY PEARSON, ESTA FAYE CHILDS,
and RAY MURDAUGH,

     Plaintiffs-Appellants,

v.

SEIU HEALTHCARE MICHIGAN,
fka SEIU Local 79,

     Defendant-Appellee.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

_____/

BEFORE:    CLAY, ROGERS, and DONALD, Circuit Judges.

    **CLAY, Circuit Judge.**  Plaintiffs Jerry Pearson, Esta Faye Childs, and Ray Murdaugh appeal an order granting summary judgment in favor of Defendant Service Employees International Union Healthcare Michigan ("SEIU HCMI") on Plaintiffs' claims under the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.  The district court granted deference to an internal adjudication of Plaintiffs' claims that Defendant improperly terminated them without cause and, finding that the adjudication was not unfair or unreasonable, dismissed Plaintiffs' LMRA claims.  Because we are persuaded that the union's adjudication is entitled to deference and was not unreasonable, we **AFFIRM**.

## FACTUAL BACKGROUND

### I.   SEIU HCMI-Local 79 Merger

On June 11, 2007, SEIU HCMI and SEIU Local 79 initiated a merger, under which Local 79 would be consolidated into SEIU HCMI.  A "Reorganization Agreement" governed the relationship between the two unions during the consolidation period.  The Reorganization Agreement placed SEIU HCMI under the governance of a temporary constitution and bylaws imposed by SEIU International.  The agreement also called for SEIU HCMI to guarantee job protection for all full-time Local 79 staff through June 30, 2008, subject to their termination for cause.  The Reorganization Agreement further required that any dispute not resolved by mutual agreement be submitted to the president of SEIU International, or the president's designee, or final resolution.  Pursuant to his authority under the SEIU International constitution, the president of SEIU International officially merged the unions on September 4, 2007.

### II.   The Hampton Agreement

Local 79's long-time president, Willie Hampton, retired shortly after the unions began the process of merging.  On May 14, 2007, Local 79's executive board approved a retirement benefits package providing Hampton with, among other things, lifetime health and life insurance benefits, a new car, and six months' severance pay.  But before he retired, Hampton and Local 79 personnel expanded the benefits package through a contract entitled "Agreement Between Willie Hampton and SEIU Local 79" (hereinafter "Hampton Agreement").  As part of that agreement, and directly at issue in this litigation, the Hampton Agreement increased protections for several Local 79 employees.  Specifically, the agreement guaranteed that:

[i]f during the 12 months following Willie Hampton's retirement any of the below listed individuals are terminated, they will receive salary and insurance coverage through June 30, 2008. This will not apply to individuals terminated for cause or who voluntarily resign or retire.

Plaintiffs Pearson, Childs, and Murdaugh were among the employees given protection under this clause.

The Hampton Agreement was signed by Hampton and Plaintiff Pearson, who was hired as Local 79's vice president shortly before the effective date of the Reorganization Agreement. It is doubtful, however, that Pearson had the authority to sign the agreement. Under the Local 79 constitution, the vice president was only empowered to represent the president when the president directed him to do so, to act as president in his absence at meetings, and sign any and all collective bargaining agreements on behalf of Local 79.

## III. SEIU HCMI Investigation and Plaintiffs' Terminations

SEIU HCMI became suspicious of the Hampton Agreement and investigated its adoption and propriety. From its investigation, SEIU HCMI's counsel found that the Hampton Agreement was discussed and adopted at a Local 79 executive board meeting on June 27, 2007. But counsel also concluded that three executive board members never received notice of the meeting. Plaintiffs contested this conclusion in a SEIU International grievance proceeding described below, arguing that notice was sent to the three board members.

SEIU HCMI's investigation faulted Pearson for his role in the adoption of the Hampton Agreement. The union argued that under Local 79's constitution, Pearson lacked the authority to negotiate or sign the Hampton Agreement and breached a fiduciary duty he owed to Local 79 by doing so. The investigation also faulted Childs for her actions during the formulation of the

3

Hampton Agreement. Childs was a Local 79 staff member and the union's recording secretary. That position allowed her to take the minutes of union and board meetings, notify SEIU International of the results of Local 79 elections, and prepare copies of resolutions in advance of union votes. Between June 11 and June 28, 2007, Childs and Hampton co-signed Local 79 checks made out to several churches, schools, and other charities, for amounts totaling roughly $50,000. SEIU HCMI believed that it was improper for Childs to co-sign the checks, because the Local 79 constitution gives only the financial secretary-treasurer the power to disburse money paid to the union for the benefit of the organization and its members.

As a result of the investigation, Local 79 disciplined the offending employees and rescinded the Hampton Agreement. On August 30, 2007, Local 79 suspended Pearson and Childs, and then the union fired Pearson on September 27, 2007 and Childs on October 1, 2007. At a Local 79 executive board meeting on December 15, 2007, the board nullified all actions taken at the June 27, 2007 board meeting because Pearson was not authorized to negotiate or sign the Hampton Agreement. The board also disapproved the contributions made pursuant to the checks signed by Childs and benefits granted to Hampton before his retirement.

For his part, Plaintiff Murdaugh retired from his employment with Local 79 in 1999. Local 79 retained him as a consultant in 2000, after which he continued to receive his pension pursuant to an SEIU policy that allowed pensioners to provide consulting services. Murdaugh was released from service on August 30, 2007.

## IV.    SEIU Adjudication

Plaintiffs appealed SEIU HCMI's decisions to the SEIU International president. Plaintiffs were jointly represented by counsel, and they submitted two briefs and twelve exhibits in support of their appeal. Plaintiffs argued that they were terminated without cause, in violation of the Reorganization Agreement. According to Plaintiffs, SEIU HCMI failed to provide them fair notice that their purported misconduct would be grounds for termination. They argued that Pearson and Childs were simply carrying out Local 79's ordinary course of business when they voted in favor of and acting pursuant to the Hampton Agreement. They also argued that Murdaugh was an employee protected by the Reorganization Agreement.

For its part, SEIU HCMI argued that Pearson and Childs violated the Labor-Management and Reporting Disclosure Act ("LMRDA"), 29 U.S.C. §§ 401–531. Section 501(a) of the LMRDA requires an officer of a labor organization "to refrain from dealing with such organization as an adverse party or holding or acquiring any pecuniary or personal interest which conflicts with the interest of such organization." 29 U.S.C. § 501(a). SEIU HCMI argued that Pearson violated § 501(a) by self-dealing—because the Hampton Agreement gave him protection greater than provided under the Reorganization Agreement—and violated § 501(a) by granting retirement benefits to Hampton upon the signing of the Hampton Agreement. SEIU HCMI argued that Childs violated the LMRDA because her act of signing the donation checks caused union funds to be spent in a manner that did not benefit union members. With respect to Murdaugh, SEIU HCMI argued that he was an independent contractor unprotected by the Reorganization Agreement's "for cause" provision.

## A.     Pearson

On April 30, 2009, the SEIU International president's designee issued a lengthy written opinion ruling in favor of SEIU HCMI. The president, through his designee, first concluded that Pearson breached his fiduciary duty. The president agreed with the union that Pearson engaged in self-dealing by securing employment benefits for himself and other Local 79 employees and also by granting Hampton unauthorized retirement benefits. The president reasoned that Pearson had a fiduciary duty to protect union members' funds and "had a heightened responsibility [because] he acted as Local 79's representative in the negotiations over the former president's retirement benefits."

The president faulted Pearson for not obtaining counsel for the union in negotiating with Hampton, who himself was represented by counsel in the negotiations. The president accepted Pearson's contention that he played no role in negotiating Hampton's benefits package, and he found that the Hampton Agreement's terms were drafted by Hampton through his counsel. Nonetheless, the president concluded that Pearson's apparent lack of involvement did not absolve him from fault in executing an agreement from which Local 79 did not benefit. Rather, according to the president, Pearson's lack of involvement represented an abdication of his fiduciary responsibility. The president concluded that Pearson further abdicated his responsibility by failing to assure that all executive board members received notice of the June 27, 2007 meeting before the Hampton Agreement was adopted.

**B.** **Childs**

The president found that Childs was employed by Local 79, served as recording secretary for six years prior to her termination, and co-signed the union's donation checks. The president recounted the recording secretary's powers under the Local 79 constitution and noted that the constitution gave the financial secretary-treasurer, but not the recording secretary, the power to disburse union funds. According to the president, Childs did not dispute that the manner in which the donation checks were handled created a conflict of interest for Hampton. Rather, like Pearson, Childs argued that she acted as Hampton's "rubber stamp," merely did as she was told, and therefore did not knowingly breach her fiduciary duty. Alternatively, Childs argued that Hampton assigned her the duty of co-signing the checks, since the financial secretary-treasurer refused to sign the checks. Childs also contended that she was faultless because the union's bank and accountant approved the donations, but the president disagreed.

The president found these defenses unpersuasive. He noted that the Local 79 constitution gave the recording secretary no check-writing authority and that it contained no provision permitting her to carry out other duties assigned by the local president. The president concluded that Childs violated the LMRDA by acting outside the scope of her fiduciary duty. According to the president, Childs' argument that she acted as Hampton's "rubber stamp" simply magnified her error, because acting in such a manner demonstrated that she ignored her fiduciary responsibility to assure that the funds were properly expended. With respect to Childs' argument that the bank and accountant ratified the donation checks, the president reasoned that ratification by any other party could not expand Childs' authority. Finally, the president said that he did not need to decide whether the

financial secretary-treasurer was unavailable to co-sign the checks, because Childs had no authority to sign the checks even if the financial secretary-treasurer refused to do so.

**C. Murdaugh**

Finally, the president noted that Murdaugh was employed at Local 79 through 1999, worked for the union as a consultant after that date, and was told his services were no longer needed on August 30, 2007. The president ruled that Murdaugh was an independent contractor and not a member of the Local 79 staff who was protected by the Reorganization Agreement. In support of this conclusion, the president reasoned that Murdaugh was paid a flat retainer fee from which no taxes were withheld, that an SEIU policy permitted union retirees to consult without losing their pensions, and that the National Labor Relations Board and the Michigan Unemployment Insurance Agency both determined that Murdaugh was a consultant.

## V. Plaintiffs' Lawsuit Challenging the SEIU Adjudication

Plaintiffs challenged the president's decision by filing a breach of contract claim, which the parties agree is governed by § 301 of the LMRA.[1] Plaintiffs alleged that SEIU HCMI had no cause to terminate them and, therefore, the terminations breached the Reorganization Agreement in violation of the LMRA. SEIU HCMI moved for summary judgment, arguing that SEIU International's adjudication of Plaintiffs' appeals was entitled to judicial deference and was fair and reasonable. The district court granted SEIU HCMI summary judgment in a brief opinion. The court

---

[1]"Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . ., or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185.

relied on cases from this circuit requiring a federal court to defer to a union's interpretation of its governing document unless that interpretation is unfair or unreasonable. *See Taylor v. Great Lakes Seamen's Union, Local 5000*, 701 F.2d 590 (6th Cir. 1983); *Vestal v. Hoffa*, 451 F.2d 706, 709 (6th Cir. 1971). The court reviewed the president's opinion and concluded that the SEIU International adjudication was neither unreasonable nor unfair. Plaintiffs timely appealed.

## DISCUSSION

### I. Deference Allotted to SEIU International's Adjudication

Plaintiffs first challenge the district court's decision to review the SEIU president's adjudication under a deferential standard of review. Plaintiffs contend that the district court should have decided *de novo* whether Local 79 terminated them with cause. Plaintiffs' contention lacks support in our cases.

On several occasions, we have stated our "reluctan[ce] to substitute [our] judgment for that of union officials in the interpretation of the union's constitution" and our willingness to "interfere only where the official's interpretation is not fair or reasonable." *Vestal*, 451 F.2d at 709 (citing *Lewis v. American Fed'n of State, County & Municipal Employees*, 407 F.2d 1185 (3d Cir. 1969)); *see, e.g., Babler v. Futhey*, 618 F.3d 514, 522–23 (6th Cir. 2010). Of course, "total judicial abstention from the review of union disciplinary proceedings is unacceptable," since "judicial timidity or indifference can leave those who seek to exercise their rights helplessly vulnerable." *Lewis*, 407 F.2d at 1192. For this reason, we refuse to defer to an internal union disciplinary proceeding that is "unfair and unreasonable." *Babler*, 618 F.3d at 523 (refusing to grant deference where disciplinary proceedings were used in a retaliatory manner); *see United Food and Commercial*

*Workers Int'l Union Local 911 v. United Food and Commercial Workers Int'l Union*, 301 F.3d 468, 475 (6th Cir. 2002) (quoting *Corea v. Welo*, 937 F.2d 1132, 1143 (6th Cir. 1991)) ("The federal courts do not sit as a 'super review' board of internal union grievances unless there is evidence of impropriety in the proceedings.").

While the Reorganization Agreement is not described by its terms as Local 79's constitution, it is nevertheless an internal governing document entitled to deference. The deference afforded to a union adjudication extends to the union's interpretation of any "internal governing document." *United Bhd. of Carpenters and Jointers of Am., Lathers Local 42-L v. United Bhd. of Carpenters and Jointers of Am.*, 73 F.3d 958, 961 (9th Cir. 1996). Internal governing documents include constitutions as well as "by-laws" and similar "promulgations" governing the union's internal affairs. *Air Wisc. Pilots Prot. Comm. v. Sanderson*, 909 F.2d 213, 218 (7th Cir. 1990). The deference extended to the interpretation of such documents is consistent with the policy of exhausting internal union procedures, a policy itself based on "'deferring judicial consideration' of 'disputes arising over internal union matters such as those involving the interpretation and application of a union constitution.'" *Holmes v. Donovan*, 984 F.2d 732, 738 (6th Cir. 1993) (quoting *Clayton v. Int'l Union, UAW*, 451 U.S. 679, 688 (1981)).

The president of SEIU International's determination of the powers given to Pearson and Childs by the Local 79 Constitution undoubtedly requires our deference. But even to the extent that the president's decision involved an application of the Reorganization Agreement, that decision is entitled to deference as well. The Reorganization Agreement does not identify itself as a union constitution, but neither is it a typical free-standing contract that a federal court may interpret without

10

reference to its application in an internal union appeal. The Reorganization Agreement provides the terms for transferring collective bargaining representation from Local 79 to SEIU HCMI, describes the plan for temporary governance of SEIU HCMI under a temporary constitution, and requires that disputes arising under the agreement should be resolved by the president of SEIU International. The Reorganization Agreement governed the affairs of Local 79 and SEIU HCMI and, therefore, regardless of whether the document was labeled as a constitution, its interpretation and application is entitled to deference.

Plaintiffs offer two reasons that the SEIU's internal adjudication is not entitled to deference. First, Plaintiffs contend that the nature of their claim—a breach of contract claim under the LMRA, rather than a challenge to union procedures raised under the LMRDA—deprives the union's adjudication of deference. Plaintiffs are incorrect. The primary consideration in deciding whether a union's internal dispute resolution is entitled to deference is not the nature of the claim raised by the plaintiffs, or the type of relief sought, but whether the plaintiff's claim challenges "the interpretation of the union's consitution" by "union officials." *Vestal*, 451 F.2d at 709.

Limitations on judicial scrutiny of contract claims brought under the LMRA are common in federal law. For example, when a union declines to pursue a union member's grievance and thereafter the union member alleges in federal court that the union breached its duty to represent the member fairly, we do not apply traditional rules of contract interpretation. Instead, the federal court is limited to deciding whether the union's actions were "arbitrary, discriminatory, or in bad faith." *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 538 (6th Cir. 2003). As a further example, when a union member is terminated by an employer and the member participates in a grievance proceeding

characterized as "final and exclusive," we are prohibited from hearing a breach of contract action from the union member alleging that the termination violated the collective bargaining agreement. *Alford v. Gen. Motors Corp.*, 926 F.2d 528, 530–31 (6th Cir. 1991).

These limitations extend to intra-union disputes such as the one giving rise to Plaintiffs' LMRA claims. Where a union member or employee challenges a union's interpretation of an internal governing document by filing a LMRA claim, we defer to internal union adjudication of disputes arising under governing documents where the adjudication was neither unfair nor unreasonable. For example, in *Millwright Local Number 1079 v. United Brotherhood of Carpenters and Joinders of America*, 878 F.2d 960 (6th Cir. 1989), a local union alleged that an international union's decision to reorganize local unions in Ohio and West Virginia breached its constitution by endangering the rights of members. *Id.* at 961. In evaluating the plaintiffs' LMRA claims, we relied on the "well settled" rule of deference to a union's fair and reasonable interpretation of its constitution. *Id.* at 962. And in examining the international union's interpretation of several provisions of its constitution, we did not apply traditional rules of contract interpretation. *See id.* at 962–66. Instead, we decided whether the international union's interpretations were fair and reasonable. *See id. Millwright* demonstrates that when a union member raises an LMRA claim disputing the union's interpretation of its governing document, our review does not take the form of *de novo* application of contract principles but rather deferential review of the fairness and reasonableness of the union's interpretation of its governing document.

By way of further example, in *United Food and Commercial Workers International Union Local 911 v. United Food and Commercial Workers International Union*, 301 F.3d at 472, a local

union alleged that the international union breached its constitution in violation of the LMRA by declining to assign a grocery store's union members to the jurisdiction of the local union. The international union argued that its decision was justified by an article in its constitution declaring the union's purpose as "the elevation of the position of its members" and its desire to further the position of future employees of the grocery store. *Id.* at 478–79. We reasoned that the international union's interpretation and application of its constitution might have subordinated the interests of current union members to that of prospective members. *Id.* at 479. We reinstated the local union's claim after the district court had dismissed it—not because the claim arose under the LMRA, but because we found good reason to believe that the union's interpretation of its constitution harmed its members. *See id.* This case again demonstrates that the factor determining our resolution of a union member's LMRA claim disputing a union's interpretation of a governing document is the fairness and reasonableness of the union's interpretation.

Thus, in spite of Plaintiffs' claim to the contrary, there is plenty of authority supporting the constraints that the district court put on itself in adjudicating Plaintiffs' LMRA claims, in this Circuit and elsewhere. *See Exec. Bd. of Transport Workers Union of Philadelphia, Local 234 v. Transport Workers Union of America*, 338 F.3d 166, 170 (3d Cir. 2003); *Fulk v. United Transp. Union*, 160 F.3d 405, 407–08 (7th Cir. 1998). The statute supplying a plaintiff's claim—be it the LMRA or the LMRDA—does not determine whether the union's interpretation of its governing document is entitled to deference. Rather, an adjudication is entitled to deference if a plaintiff claims error in the interpretation of the union's governing document by union officials. *See Vestal*, 451 F.2d at 709. Plaintiffs claim such an error.

Second, Plaintiffs argue that the president applied a higher burden of proof than would be applied to their claims in federal court, but that assertion is wrong. There is no evidence in the president's lengthy opinion that he applied anything other than the preponderance of the evidence standard; contrary to Plaintiffs' argument, the opinion's passing use of the term "arbitrary" does not indicate that the president applied the "arbitrary and capricious" standard. And the president's application of a higher standard of proof would not necessarily deprive his decision of deference. Plaintiffs provide no case or statutory authority for the contention that it would. *Ruzicka v. General Motors*, 85 L.R.R.M. (BNA) 2419, 1973 WL 11618 (E.D. Mich. 1973), is not persuasive on this point, because the plaintiff's LMRA claim at issue in that case arose from grievance proceedings against his employer and, as such, in no way flowed from a union's interpretation of its constitution. Therefore, the district court was correct in deferring to the union's interpretation of the Reorganization Agreement.

## II. SEIU International's Adjudication of Plaintiffs' Terminations

Because SEIU International's adjudication of Plaintiffs' claims merited deference, the president's adjudication should be honored so long as it was fair and reasonable. *United Bhd. of Carpenters & Joiners of Am., Dresden Local No. 267*, 992 F.2d 1418, 1423 (6th Cir. 1993). We have held that a union's internal adjudication is unreasonable where a union's interpretation of its constitution benefitted prospective members at the expense of present members, *see United Food and Commercial Workers Int'l Union Local 911*, 301 F.3d at 479, and where a complaint's allegations indicated that "unconscionable" machinations by an international union's majority faction led to the decertification of a local union's election in which a slate of dissident candidates had

prevailed. *See UAW Local 594 v. Int'l Union, UAW*, 956 F.2d 1330 (6th Cir. 1992). In this case, however, nothing unfair or unreasonable tainted the international union's adjudication.

### A.    Pearson

Pearson argues that the SEIU International president erroneously construed the Local 79 constitution, which allowed the vice president "to represent the President when directed to do so" and "to sign any and all collective bargaining agreements on behalf of the Union in the place and stead of the President." But Plaintiffs effectively concede that the president's interpretation of this provision was not unreasonable. They describe this provision as

> ambiguous at best with regards to the Vice-President's duties in this situation. In this rare situation, where the President had entered into a retirement agreement with the union, there was arguable authority for Pearson's act. It can hardly be said that this provision, as written, provides fair notice that Pearson was required to negotiate a contract like the Hampton Agreement or that he could be terminated for signing it.

If Article VIII "arguabl[y]" prohibited Pearson's conduct, and the president adopted an "arguable" interpretation, then the president's interpretation cannot be unfair or unreasonable. In order to prevail, Pearson would have needed to persuasively argue that the president's interpretation was unsupportable.

Pearson also argues, as he did in front of the president, that he was not at fault when he signed the Hampton Agreement pursuant to an order from Hampton. While we find it somewhat unsettling that Pearson was punished for signing an agreement that the SEIU International's general counsel voted to approve, this fact falls short of establishing the unreasonableness of the president's adjudication. Pearson's affidavit does not establish that he was forced to sign the Hampton Agreement, as he argues it does. Rather, the affidavit asserts that the general counsel, along with

Pearson and other officials, voted to adopt the agreement, which still had to be ratified by the executive board. That others participated in adopting the agreement does not mean that Pearson had no independent responsibility to the local union. As the SEIU president reasonably concluded, votes in favor of the agreement by SEIU International personnel are ultimately irrelevant to the issue of whether Pearson upheld his own duty.

The president concluded that Pearson breached his fiduciary obligations. This conclusion was neither unfair nor unreasonable, given that Pearson participated in the use of Local 79 funds for a purposes that did not benefit members, failed to secure legal representation to negotiate the Hampton Agreement, and otherwise failed to protect Local 79's interest during the agreement's adoption. As we stated earlier, the LMRDA prohibits a union official such as Pearson from "dealing with [a labor] organization as an adverse party . . . in any matter connected with his duties" and "from holding or acquiring any pecuniary or personal interest which conflicts" with the union's interests. 29 U.S.C. § 501(a). Consistent with these duties, the LMRDA required Pearson to handle the union's money "in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder" and prohibited him from "engaging in transactions that provide[d] a direct personal benefit." *Anderson v. Int'l Union, United Plant Guard Workers of Amer.*, 370 F.3d 542, 553 (6th Cir. 2004) (alterations in original and internal quotation omitted). In *Anderson*, we held that ERISA did not protect three union officers' retirement benefits, where the officers violated their fiduciary duties under § 501(a) by voting in favor of an early retirement plan that granted them retirement benefits more generous than the union's constitution allowed. *Id.* at 554–55. So it was here: Pearson was charged with making certain that union funds were used for

the benefit of members, but he voted in favor of an agreement that conferred upon Hampton greater retirement benefits than those previously granted by the Local 79 board, which provided no discernible benefit to Local 79 members. That others voted for this proposal did not absolve Pearson from independently determining whether the Hampton Agreement violated his fiduciary duty.

To the extent that approval by the executive board could have legitimated the Hampton Agreement, it was not unreasonable for the SEIU International president to conclude that the June 27, 2007 executive board vote was procedurally defective. Article XII of the Local 79 constitution allows the president to call special meetings of the executive board and requires a majority vote of the board to approve actions on behalf of the union. The constitution does not specify the form that any notice of a special meeting should take. The president concluded that any attempt to notify the board members was insufficient and that the board members had to receive actual notice of the meeting. Thus, the president essentially construed the Local 79 constitution to require board members to receive notice of a meeting for notice to have been legitimately given. Plaintiffs contend that the president unreasonably concluded that three members of the Local 79 executive board did not receive notice of the June 27, 2007 meeting; they insist that notice was given to the board members. The implication of Plaintiffs' argument is that the president interpreted the Local 79 constitution unreasonably by reading Article XII to require board members to receive actual notice of a special meeting. The president's interpretation is not unreasonable. To the contrary, the president's interpretation of Article XII is plausible, even if his interpretation is not the only plausible one.

**B.      Childs**

Childs makes arguments against her termination similar to those Pearson raises.  First, Childs argues that she was a "rubber stamp" for Hampton in signing the Local 79 checks directed to various charitable organizations and that her passive role in making the contributions absolves her from wrongdoing.  The president's conclusion to the contrary was not unreasonable.  The powers conferred on the recording secretary under the Local 79 constitution are clear: Article IX permits the recording secretary "to keep a correct and accurate account of the proceedings of each meeting," "to notify the International Secretary-Treasurer" of the names and address of elected officers, and "to furnish the chairperson of each committee with a copy of such resolutions as may be adopted by the Local Union applicable to its respective duties."  Childs simply had no authority to sign the checks.

**C.      Murdaugh**

Finally, Murdaugh argues that it was unreasonable and unfair for the president to conclude that he was an independent contractor.  Murdaugh first takes issue with the deference the district court allotted the president's opinion on this point, arguing that no interpretation of a governing document was required to determine whether Murdaugh was terminated in breach of the Reorganization and Hampton Agreements.  To the contrary, the president's decision did involve an interpretation of the Reorganization Agreement, as he determined that Murdaugh was not protected as "full-time Local 79 staff, subject to . . . termination for cause."  Murdaugh also asserts that the president should have applied Michigan law to the question of whether Murdaugh was an employee.  But the LMRA and its interpretation by federal courts, not state law, governs Murdaugh's claim.  *See Textile Workers Union of Amer. v. Lincoln Mills*, 353 U.S. 448, 456–57 (1957) (holding that

federal common law governs suits under § 301(a) of the LMRA). There is otherwise no support for Murdaugh's contention that the president should have applied Michigan's "economic realities" test in making his determination. *Cf. Mantei v. Mich. Pub. Sch. Emp. Ret. Sys.*, 663 N.W.2d 486 (Mich. Ct. App. 2003).

Finally, Murdaugh claims that the president's ultimate conclusion that he was an independent contractor was unreasonable, but the record does not support this claim. Taxes were not withheld from Murdaugh's compensation checks from Local 79, as he was paid by way of a Form 1099-MISC. As a result, the Michigan Unemployment Insurance Agency concluded that Murdaugh was not an employee of Local 79. The National Labor Relations Board made the same finding. As a further point upon which the president did not rely, Murdaugh was only allowed to continue working for the union and to receive pension benefits if he was retained as a consultant to Local 79. Murdaugh does not contest that he received pension benefits while working for Local 79 after he retired in 1999. Murdaugh could not have received pension payments if he was a full-time employee.

## CONCLUSION

For the reasons stated above, the district court correctly applied the LMRA by deferring to and upholding the decision of SEIU International's president. Therefore, we **AFFIRM** the district court's judgment.

**BERNICE B. DONALD, Circuit Judge, dissenting.** The majority affirms the lower court's grant of summary judgment on grounds that the union's adjudication is entitled to deference and was not unreasonable. I respectfully dissent because, under this circuit's case law and the relevant statutory framework, no such deference is warranted. Since summary judgment was granted before the parties had engaged in discovery and because material disputes of facts remain, the proper course for this court would be to reverse and remand for further proceedings.

The majority's decision is predicated upon a series of questionable premises. First, the opinion characterizes the Reorganization Agreement as an internal governing document, the legal equivalent of a constitution, rather than a contract between two unions. While a union constitution is a "contract between unions" for purposes of the LMRA, *United Assoc. of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the U.S. and Canada v. Local 334*, 452 U.S. 615 (1981), it does not follow that a contract between unions is a constitution whose interpretation requires deference from the federal courts.

The Reorganization Agreement at issue is a pact between the two unions setting forth the responsibilities of the parties during the period before and immediately after their merger. The Reorganization Agreement itself specifically provides that the two unions "shall be governed by a Temporary Constitution and Bylaws to be imposed by the SEIU International President." RA, ¶ 9. Since the contract identifies the external document that will serve as the constitution, the contract cannot itself be the constitution.

The majority does not cite to a single Sixth Circuit precedent that applies deference to a unions interpretation of a "governing document" where the document is not the union constitution itself, nor could I find such a case. The cases relied on by the majority and the district court, *Vestal v. Hoffa* , 451 F.2d 706, 709 (6th Cir. 1971), and *Taylor v. Great Lakes Seamen's Union, Local 5000*, 701 F.2d 590, 592 (6th Cir. 1983), did not involve documents other than the union's constitution. The disputes in those cases were related to specific language contained in the union constitution; no documents beyond the constitution itself were considered. *Taylor*, 701 F.2d at 591; *Vestal*, 451 F.2d at 706-08.

Likewise, the other Sixth Circuit cases cited in the opinion do not support the majority's position. *Babler v. Futhey*, 618 F.3d 514 (6th Cir. 2010), analyzes whether a union executive board's interpretation of internal constitutional provisions in a disciplinary proceeding are reasonable. *Id.* at 522-23. The *Babler* court never mentions applying deference to the interpretation of any document other than a union's internal constitution. The final Sixth Circuit decision cited, *Holmes v. Donovan*, 984 F.2d 732 (6th Cir. 1993), likewise refers only to "the interpretation and application of a union's constitution." *Id.* at 738.

The majority relies heavily on a Ninth Circuit case which does implicitly equate the term "governing document" with "constitution." Even this case, however, falls short of finding deference due to a union's interpretation of a merger agreement. The Ninth Circuit was confronted with whether a union's interpretation of an "Affiliation Agreement," through which a local union became affiliated with the United Brotherhood of Carpenters and Joiners of America, "is subject to the high

degree of deference due a union's construction of its own rules, regulations and constitution, or whether the affiliation agreement is to be interpreted by the courts like any other contract without such deference." *United Bhd. of Carpenters and Joiners of Am., Lathers Local 42-L v. United Bhd. of Carpenters and Joiners of Am.*, 73 F.3d 958, 959-60 (9th Cir. 1996). Although the case for deference was at least as strong in the Ninth Circuit case as it is in the case before this court, the court declined to decide the issue, because it reached "the same result without giving deference." *Id.*

The majority's deference to the union's interpretation of its "governing documents" is thus without a proper legal foundation. In expanding the application of deference to a non-constitution contract, the court is charting new ground, unsupported by any precedent.

Even if, however, the Reorganization Agreement could be validly deemed the equivalent of a constitution, I would disagree with the majority's holding because of its second foundational premise: that the union president's designee "interpreted" this agreement. In fact, the Designee's decision upholding the termination of Appellants did not involve the "interpretation" of that document *or* the actual union constitution, as there was no ambiguity in those documents to resolve or interpret. Instead, the Designee merely concluded that the Appellants had breached their fiduciary duties to the union and were therefore subject to termination "for cause." Although I agree with the majority that this finding of fact appears to have been reasonable, the decision does not warrant deference by the court.

While the district court, and the majority, erred in viewing the Designee's decision as the interpretation of the union's constitution, the more fundamental error in the district court's judgment,

22

implicitly endorsed by the majority opinion, lies in its treatment of Appellants' action as an appeal of the union's decision. This view is evidenced by the district court's statement that "[t]he Court is not compelled to conduct a *de novo* review of the [union's] decision." This misunderstanding of the nature of the case before it is grounded in the court's failure to properly distinguish between two related statutes: the Labor-Management Reporting and Disclosures Act ("LMRDA") and the Labor Management Relations Act ("LMRA").[2]

While similarly titled, the statutes are very different in their scope and grant of jurisdiction to the courts. To appreciate the important differences between the two statutes, we look first to the LMRDA, which does not govern the instant case.

Title I of the LMRDA sets forth certain fundamental rights guaranteed to all union members and provides a private right of action for infringement of those rights. 29 U.S.C. §§ 411-12 (2006). Typically central suits brought under LMRDA is § 411(5): "No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization . . . unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing." Pursuant to the guarantee of a "full and fair" disciplinary hearing, the charging party must provide some evidence at the disciplinary hearing to support the charges made. *Int'l Bhd. of Boilermakers v. Hardeman*, 401 U.S. 233, 246 (1971). A district court's role in this context is solely to ensure that there was no

---

[2]Both the parties and the district court acknowledge that the Plaintiffs' claims are governed by § 301 of the LMRA.

denial of due process, i.e., that the union member "was afforded a full and fair hearing at which some evidence of his guilt on a majority of the specified charges was adduced." *Charron v. AFL-CIO*, 470 F.2d 156, 158 (6th Cir. 1972). Thus, in a "full and fair hearing" suit brought under the LMRDA, a district court acts in a limited, quasi-appellate capacity.

In contrast, § 301 of the LMRA provides as follows:

> ***Suits for violation of contracts*** between an employer and a labor organization representing employees in an industry affecting commerce as defined by this Act, or ***between any such labor organizations***, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a) (2006) (emphasis added). Federal district courts have explicit authority under the LMRA to try breach of contract suits, not only by applying traditional rules of contractual interpretation but also by fashioning a body of federal law for enforcement of union contracts. *See Textile Workers Union of America v. Lincoln Mills*, 353 U.S. 448 (1957) (discussing the broad authority of the courts in such suits); *see also UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983). Under the LMRA, a district court serves as a full trial court in every regard, responsible for the resolution of contractual disputes. Unlike under the LMRDA, it is not relegated to a constrained, quasi-appellate function.

Consequently, there is simply no basis in the law for the constraints the district court placed upon itself in the present case. Giving deference to the disciplinary decision of the Designee and limiting the court's authority to a determination of reasonableness would have been appropriate if Appellants had challenged the disciplinary decision directly. Such an action would have been

appropriately brought under the LMRDA, pursuant to the district court's role under that statute to ensure that there was no denial of due process.

However, the present suit for violation of a contract between two unions, to which Appellants are third-party beneficiaries, should be tried like any other contract-based suit brought under § 301 of the LMRA. Contrary to the majority's assertion, Appellants' action is not a challenge to the union's interpretation of its constitution, but a suit for breach of contract, quite independent from the internal proceedings which came before it. Even if there were issues of interpretation of the union's constitution at issue here, which there are not, the court, while giving due deference to those interpretations, would nonetheless still be required to resolve the claims of breach of contract before it.

The central issue here is whether Appellants engaged in wrongdoing sufficient to warrant termination under the Reorganization Agreement. It appears that at least some of the facts pertinent to this issue are in dispute, making summary judgment inappropriate at this stage of the proceedings. Accordingly, I respectfully dissent.